**No. 2017-1601**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

ZUP, LLC,

*Plaintiff-Appellant,*

*v.*

NASH MANUFACTURING, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Virginia, Case No. 3:16-cv-00125
The Honorable Henry E. Hudson, Judge Presiding.

# BRIEF OF PLAINTIFF-APPELLANT ZUP, LLC

Matthew M. Wawrzyn
WAWRZYN & JARVIS LLC
2700 Patriot Boulevard, Suite 250
Glenview, IL 60026
(847) 656-5864
*matt@wawrzynlaw.com*

*Counsel for Plaintiff-Appellant*
*ZUP, LLC*

## CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4, counsel for Appellant ZUP, LLC certifies the following:

1. The full name of every party or amicus represented by me is:

    ZUP, LLC

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

    N/A

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

    N/A

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

| WAWRZYN & JARVIS LLC | DURRETTECRUMP PLC | SIPRUT PC |
|---|---|---|
| Matthew M. Wawrzyn | Wyatt B. Durrette, Jr. | Richard S. Wilson |
| Stephen C. Jarvis | Christine A. Williams | 17 N. State Street, |
| 2700 Patriot Boulevard | 1111 East Main Street | Suite 1600 |
| Suite 250 | 16th Floor | Chicago, IL 60602 |
| Glenview, IL 60026 | Richmond, VA 23219 | (312) 236-0000 |

Date: April 10, 2017

*/s/ Matthew M. Wawrzyn*
Matthew M. Wawrzyn
*Counsel for Appellant ZUP, LLC*

## TABLE OF CONTENTS

STATEMENT OF RELATED CASES ........ 1

JURISDICTIONAL STATEMENT ........ 1

*Jurisdiction in the District Court* ........ 1

*Jurisdiction in the Court of Appeals* ........ 1

STATEMENT OF THE ISSUES ........ 2

STATEMENT OF THE CASE ........ 3

Statement of the Facts ........ 4

*Scope and Content of Prior Art* ........ 4

*Differences Between the Patent Claims and the Prior Art* ........ 8

*Secondary Considerations* ........ 12

*Level of One of Ordinary Skill in the Art* ........ 13

*Infringement of the '681 Patent by Nash* ........ 14

*Obviousness* ........ 14

*No Contributory Infringement* ........ 16

SUMMARY OF THE ARGUMENT ........ 17

ARGUMENT ........ 19

Standard of Review ........ 19

I. THE DISTRICT COURT FAILED TO SUPPORT ITS OBVIOUSNESS HOLDING WITH CLEAR-AND-CONVINCING EVIDENCE OF A MOTIVATION TO COMBINE THE ASSERTED PRIOR ART AND ALSO IMPROPERLY SHIFTED THE BURDEN OF PROVING NON-OBVIOUSNESS TO ZUP. ........ 19

A. The District Court's Obviousness Finding Lacks the Required Rational Underpinning Demonstrating Why

the References Would Have Been Combined In 2008. ...................... 20

B. Nash Produced No Evidence On Secondary Considerations and the District Court Improperly Placed the Burden On ZUP to Prove Non-Obviousness. ................................................................ 23

II. ZUP COULD PROVE THAT THE VERSA BOARD CONTRIBUTORILY INFRINGES THE '681 PATENT BECAUSE THE VERSA BOARD INCLUDES COMPONENTS THAT CAN ONLY BE USED TO INFRINGE. ........................................ 25

CONCLUSION ................................................................................................ 27

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

## TABLE OF CITATIONS

### CASES

*Ecolochem, Inc. v. S. Cal. Edison Co.*,
227 F.3d 1361 (Fed. Cir. 2000) .......... 20, 21

*Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*,
149 F.3d 1309 (Fed. Cir. 1998) .......... 19

*In re Bill of Lading Transmission & Processing Sys. Patent Litig.*,
681 F.3d 1323 (Fed. Cir. 2012) .......... 17, 26

*InTouch Tech., Inc. v. VGO Comm'cns, Inc.*,
751 F.3d 1327 (Fed. Cir. 2014) .......... 20, 23

*Microsoft Corp. v. i4i Ltd. P'ship*,
564 U.S. 91 (2011) .......... 23

*Pfizer, Inc. v. Apotex, Inc.*,
480 F.3d 1348 (Fed. Cir. 2007) .......... 24

*Ricoh Co., Ltd. v. Quanta Computer Inc.*,
550 F.3d 1325 (Fed. Cir. 2008) .......... 3, 19, 25, 26

### STATUTES

28 U.S.C. § 1295 .......... 1

28 U.S.C. § 1331 .......... 1

28 U.S.C. § 1338(a) .......... 1

35 U.S.C. § 103 .......... 1

### RULES

Fed. R. Civ. P. 56(c) .......... 56

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rules 28(a)(4) and 47.5, counsel for Appellant ZUP, LLC states: (a) no other appeal in or from the same civil action in the trial court was previously before this or any other appellate court; and (b) no other case known to counsel to be pending in this or any other court will directly affect or be directly affected by this Court's decision in this consolidated appeal.

## JURSIDICTIONAL STATEMENT

### *Jurisdiction in the District Court*

This action arose under the patent laws of the United States, 35 U.S.C. §§ 101 *et seq*. Thus, the District Court had subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a).

### *Jurisdiction in the Court of Appeals*

The Court of Appeals has jurisdiction under 28 U.S.C. § 1295. ZUP, LLC ("ZUP") seeks review of the District Court's holdings that claims 1 and 9 of ZUP's patent were invalid under 35 U.S.C. § 103 and that Appellee Nash Manufacturing, Inc. ("Nash") did not infringe claim 9, and the District Court's consequent grant of Nash's motion for summary judgment on January 13, 2017, which was a final judgment that disposed of the parties' claims. ZUP timely filed its notice of appeal on February 3, 2017.

## STATEMENT OF THE ISSUES

1. ZUP owns U.S. Patent No. 8,292,681 (the "'681 patent"), which covers a method performed on a water recreation device in which a rider being towed by a boat simultaneously engages a towrope, side-by-side handles, and side-by-side foot bindings to move from prone to kneeling to crouching to standing positions. Was summary judgment in favor of defendant Nash holding the '681 patent obvious erroneous for one or more of the following three reasons?

- Neither the asserted prior art references nor Nash's expert provides a basis for one of ordinary skill in the art in 2008 to combine a towrope, side-by-side handles, and side-by-side foot bindings for simultaneous engagement by the rider to move from prone to kneeling to crouching to standing positions.
- Nash failed to introduce evidence of secondary considerations, through its expert or otherwise.
- The District Court placed the burden on ZUP to prove non-obviousness.

2. The accused device is called the "Versa" board. It has a towrope, side-by-side handles, and side-by-side foot bindings that could be configured for simultaneous engagement by the rider to move from prone to kneeling to crouching to standing positions. These components could also be configured in a

non-infringing manner; for example, placing the foot bindings one in front of the other or removing the side-by-side handles. Did the District Court err for the following two reasons when granting summary judgment in favor of Nash and holding no contributory infringement as a matter of law?

- The District Court found that the Versa board could be configured in an infringing manner identical to the ZUP product covered by the '681 patent.
- The District Court failed to apply *Ricoh Co., Ltd. v. Quanta Computer Inc.*, 550 F.3d 1325 (Fed. Cir. 2008), where this Court held that "it is entirely appropriate to presume that one who sells a product containing *a component that has no substantial noninfringing use* in that product does so with the intent that the component will be used to infringe." *Id.* at 1338 (emphasis in original).

## STATEMENT OF THE CASE

ZUP is the exclusive owner of all rights in the '681 patent. (Dkt. No. 1 ¶ 34.) On March 1, 2017, ZUP filed a four-count complaint against Nash, alleging contributory patent infringement, patent infringement by inducement, trade secret misappropriation, and breach of contract. (Dkt. No. 1.) On May 5, 2016, Nash filed an answer and counterclaim, alleging that the '681 patent was invalid and that Nash did not infringe the '681 patent. (Dkt. No. 25.)

On September 14, 2016, after some discovery, Nash moved for summary judgment on its counterclaims regarding invalidity and non-infringement, as well as summary judgment in Nash's favor on the trade-secret and breach-of-contract claims. (Dkt. No. 35.)

On January 13, 2017, the District Court granted Nash's summary judgment motion in all respects. (Dkt. Nos. 57 & 58.) On February 3, 2017, ZUP filed its notice of appeal. (Dkt. No. 59.)

## Statement of the Facts

The District Court's holdings regarding obviousness and no contributory infringement as a matter of law are pertinent to this appeal. Thus, the following facts are grouped according to the obviousness and non-infringement holdings of the District Court.

### *Scope and Content of Prior Art*

The U.S. Patent and Trademark Office ("PTO") examiner based allowance of the '681 patent claims on various factual determinations, including determinations that bear on two of the prior art references that Nash argued below invalidate the '681 patent.

First, the examiner made determinations regarding Echols. (Appx497-503 (U.S. Patent No. 5,083,955).) During examination of the patent-in-suit, the patentee amended the asserted claim 9 (then 15) to include "<u>a first and a second</u>

foot binding coupled to the top surface of the riding board . . . ." (Appx293 (emphasis in original).) At this time of the prosecution, claim 15 (now 9) lacked the limitations that the foot bindings be disposed side-by-side in the middle section of the board and that the handles be disposed side-by-side in the front section of the board. (*Compare id. with* Appx70 ('681 patent), col. 12:34-64 (claim 9).) Thus, the examiner determined that "[i]t would have been obvious to one of ordinary skill in the art at the time of the invention to provide foot bindings to the board of Clark as taught by Echols." (Appx283.) In other words, as amended, claim 15 (now 9) at the time broadly claimed foot bindings that were satisfied by the bindings taught in Echols: "A ski board is an aquatic towing device having a pair of stirrups for the rider's feet. As the rider rides the ski board, his forward foot is positioned at an angle approximately 45° to the longitudinal axis of the ski board." (Appx500, col. 1:39-42).) It did not matter that the Echols foot bindings were *not* side-by-side in the middle section of the board because claim 15 (now 9) did not contain such a limitation. (Appx293.) The examiner reasoned that combining the bindings of Echols "would have been desirable so as to enhance the stability of the rider and board as is old and well known in the art." (Appx283.)

Second, Nash also asserted Fryar as an invalidating reference. (Appx504-12 (U.S. Patent No. 6,585,549).) During prosecution of the '681 patent, the examiner rejected claim 1 based on Fryar because "[i]t would have been obvious to one of

ordinary skill in the art at the time of the invention to provide protruding rails to the board of Echols as taught by Fryar. Such a modification would have been desirable so as to enhance the stability thereof." (Appx278-79.) At the time of this rejection, claim 1 lacked the limitations that the foot bindings be disposed side-by-side in the middle section of the board and that the handles be disposed side-by-side in the front section of the board. (*Compare* Appx293 *with* Appx70 ('681 patent), col. 11:36-12:4 (claim 1).) Additionally, at the time of the rejection based on Fryar, claim 1 lacked the following limitation: "wherein the first and second handles and the first and second foot bindings are configured for simultaneous engagement by a rider to position the rider in a crouching stance facing in a forward direction . . . ." (*Id.* ('681 patent), col. 11:54-57.)

The patentee amended the claims again to address, among other things, the examiner's rejections based on Echols and Fryar. The amendments to claims 1 and 15 (now 9) resulted in issuance of the '681 patent over Echols and Fryar. Relevant here, claim 1 and 15 (now 9) were amended to require foot bindings disposed side-by-side in the middle section of the board and handles disposed side-by-side in the front section of the board. (Appx216 & 218-29.) Claim 1 was also amended to include the following limitation: "wherein the first and second handles and the first and second foot bindings are configured for simultaneous engagement by a rider to position the rider in a crouching stance facing in a forward direction . . . ."

(Appx216.) The examiner concluded after an interview with the patentee as follows:

> Applicant argues the combination of Echols and Fryar fails to provide side by side foot bindings and handles configured for *simultaneous engagement* as now proposed. Such would appear to define over the rejection based upon the above noted references, but could be considered a New Issue after final.

(Appx270 (emphasis added).)

The examiner allowed the '681 claims over Echols and Fryar and the patentee explained the distinctions: "The Applicants indicated that amended independent Claim 1 specifically defines foot bindings positioned side-by-side, rather than offset as shown in Figs. 1 and 5 in Echols. Furthermore, the Applicants argued that amended independent Claim 1 specifically defines side-by-side handles configured complementary to the side-by-side foot bindings for *simultaneous engagement* by a rider for the purpose of positioning that rider in a stable crouching stance, rather than a handle in the form of a tow rope handle operating separately from the board surface as disclosed in Echols (Fig. 8) . . . ." (Appx222-23 (emphasis added).) Similarly, with respect to claim 15 (now 9), the patentee persuasively reasoned, "The Applicants have amended Claim 15 to recite 'first and second handles disposed side-by-side *on the front section* of the top surface of the riding board' and 'first and second foot bindings disposed side-by-side *on the middle section* of the top surface of the riding board' which are *simultaneously*

*engaged* by a rider while in a crouching stance as recited in Claim 15." (Appx230 (emphasis added).)

Nash also argued below that Parten was an invalidating reference. (Appx513 (U.S. Patent No. 6,306,000).) Parten lacks "a tow hook disposed on the front section of the riding board," as claimed in asserted claim 9 of the '681 patent. (*Compare* Appx522 *with* Appx70, col. 12:40-41.) Parten also lacks "first and second handles disposed side-by-side on the front section of the of the riding board . . . ." (*Compare* Appx522 *with* Appx70, col. 12:42-43.)

Patentee disclosed Parten at the very outset of the specification as an example of the shortcomings in the prior art: "Other solutions such as that disclosed in U.S. Pat. No. 6,306,000 provide a single board that may be operated in a forward facing direction while standing with feet in a side-by-side configuration." (Appx65, col. 1:29-32.) Neither the examiner nor patentee found Parten material to the '681 patent because Parten lacks side-by-side handles and a tow hook that can be simultaneously engaged achieving ease of use: "A need thus exists for an improved water recreation device that does not suffer the drawbacks of existing solutions." (Appx65, '681 patent, col. 1:51-52.)

***Differences Between the Patent Claims and the Prior Art***

At the time of invention, December 2008, the market for water-recreation devices had long been stagnant. (Appx414 (Declaration of James Emmons ¶¶ 13-

16).) At a general level, one could divide the market into three segments: (a) inner tubing ("tubing"), where a rider is for the most part passively towed by a motorboat holding onto the tube; (b) kneeboarding, where a rider kneels on a board while being towed by a motorboat; and (c) water skiing and wakeboarding, where a rider stands on skis or a board while being towed by a motorboat. (*Id.* ¶ 13.)

Tubing requires little strength or athletic ability. (*Id.* ¶ 14.) Kneeboarding requires moderate strength and athletic ability. (*Id.*) While both water skiing and wakeboarding require upper body strength and athleticism to get up out of the water into a standing riding position. (*Id.*)

The water-recreation market had for a long time—50 years—focused on creating stability for a rider strictly within a pre-determined riding position, whether that be tubing, kneeboarding, skiing, or wakeboarding. (*Id.* ¶ 16; *see also* Appx283 (Examiner of '681 patent re combining the foot bindings of Echols: "Such a modification would have been desirable so as to enhance the stability of the rider and board as is *old and well known in the art*.") (emphasis added); Appx426 (Parten Decl.) ¶ 17 ("These modifications would have been desirable so as to enhance the stability of the rider and the board in a variety of riding positions and are old and well known in the art."); Appx457 (Garris Decl.) at 21 ("[A] person of ordinary skill in the art would certainly be concerned about the stability of the board and would be motivated to combine Echols and Fryar.").)

When Glen Wade Duff and Timothy Walter Zeckser invented the original ZUP board that the '681 patent covers, their purpose was ease of use. (Appx416-17 (Duff Decl.) ¶¶ 3-5.) In 2008, Duff bought a motorboat to spend more time with his wife and teenage daughters. (*Id.* ¶ 3.) The Duffs began to take groups of kids from their Church out water skiing and wakeboarding. (*Id.*) Glen Duff noticed how difficult it was for some of the kids to get up on skis or a wakeboard, and, worse, saw how these kids would quickly not participate in an activity that the more athletic kids were enjoying immensely. (*Id.*) This was the motivation for Duff and Zeckser to tinker with a board that contained a tow hook, side-by-side handles, and side-by-side foot bindings that the rider could simultaneously engage in order to more easily get up out of the water into a standing position. (*Id.* ¶ 4.) And, after a lot of testing ("wipe outs"), the ZUP board was born:

> A method of riding a water recreation device on a body of water comprising:
>
> placing a water recreation device into a body of water, the water recreation device comprising:
>
> a riding board having a top surface, a bottom surface, a front section, a middle section, and a rear section;
>
> a tow hook disposed on the front section of the riding board;
>
> *first and second handles disposed side-by-side on the front section of the top surface of the riding board aft of the tow hook*; *and*
>
> *first and second foot bindings disposed side-by-side on the middle section of the top surface of the riding board aft of the first and*

> *second handles*;
>
> attaching *a tow rope to said tow hook, said tow rope also attached to a water vehicle*;
>
> grasping the first and second handles of the water recreation device to establish a prone start position;
>
> maintaining said prone start position by the rider until the riding board has achieved a substantially parallel position relative to the surface of the water;
>
> achieving a kneeling position by the rider by placing both knees on the top surface of the riding board;
>
> *achieving a crouching position by the rider by placing a first foot into the first foot binding and then placing a second foot into the second foot binding;*
>
> *grasping the tow rope by the rider by releasing the first and second handles;*
>
> *removing the tow rope from the tow hook by the rider;*
> standing on the riding board by the rider while continuing to grasp the tow rope.

(Appx70 ('681 patent, claim 9) (emphasis added).) The emphasized claim language demonstrates the components of the invention that are simultaneously engaged by the rider to more easily achieve a standing position. (Appx416-17 (Duff Decl.) ¶ 4.)

In December 2008, one of ordinary skill in the water-recreation device market was focused on achieving stability for a rider in a predetermined riding position. (Appx414-15 (Emmons Decl.) ¶¶ 15-16, 18.) Nash's asserted prior art

references demonstrate this, lacking a tow hook and side-by-side handles in the front section and side-by-side foot bindings in the middle section that may be simultaneously engaged to move from the prone position, to kneeling, to crouching, to standing. (*Id.* ¶ 18.)

As of December 2008, the water-recreation device industry had long been in a rut. (*Id.* ¶¶ 15-16.) The president of Nash, Keith Parten, illustrates the stagnation of the industry and the change that the ZUP board and '681 patent portended. Parten testifies, "Nash had been in the water sports business for 50 years and manufacturing knee boards for over 15 years." (Appx420 ¶ 8.) Nash points to a long list of patents (*id.* ¶ 3), but none of these inventions offers a rider ease of use on the scale of the '681 patent. The Nash patents reflect the stagnant industry, where a board may be towed a certain way, or a rider may ride a board more stably in a certain position, but a tow hook, side-by-side handles and bindings were not provided to the rider for simultaneous engagement. (*See, e.g.,* Appx522.)

***Secondary Considerations***

Parten's reaction to the ZUP board is compelling evidence of a long-felt but unresolved need: "You have a great product by the way!" (Appx139.) That is what Parten exclaimed at the outset of ZUP's and Nash's initial telephone conference on February 5, 2014. (*Id.*) Glen Duff explained that ZUP believed its board could reach a broader market: "We want to be selling to Wally Weekender. This made

people feel like, 'my kids can do this, and maybe I can too!'" (*Id.*) Parten agreed: "Think you are spot on with Wally Weekender. Same guy that rides a kneeboard and tube. Want to be able to do it the first time every time." (*Id.*) Nash's inability to come up with the idea for 50 years and Nash's quick, enthusiastic acceptance of the idea shows that there was a long-felt but unresolved need to provide the market with ease of getting into a standing position. (Appx414 (Emmons Decl.) ¶¶ 15-16.)

Nash copied ZUP instead of partnering with ZUP. The infringing Versa board has a tow hook at the front section, side-by-side handles at the front section, and side-by-side foot bindings at the middle section:




(Appx139.) All of these elements may be simultaneously engaged to perform the method of claim 9 of the '681 patent: [https://youtu.be/bIIkbIkVui8](https://youtu.be/bIIkbIkVui8).

***Level of one of ordinary skill in the art***

ZUP does not dispute Nash's definition of one of ordinary skill in the art as of 2008—"a person with at least 3-5 years' experience in the design and manufacture of water recreational devices or have a bachelor's degree in

mechanical engineering." (Appx423-24 (Parten Decl) ¶ 12.)

***Infringement of the '681 Patent by Nash***

Nash sells the Versa board knowing of the '681 patent and knowing that the Versa board is especially adapted for use in infringement of the '681 patent. Nash knew of the patent (Appx129) and knew that the patent was valid. (Appx130.) Nash knew that the Versa board was especially adapted to infringe the '681 patent. (Appx7; *see also* https://youtu.be/bIIkbIkVui8.)

***Obviousness***

The District Court found "by clear and convincing evidence that Claim 1 of the '681 Patent would have been obvious to one of ordinary skill in the art over the Clark Patent in view of the Parten '000 Patent, the Parten '872 Patent, the Fleischman Patent, the Stewart Patent, and the Fryar Patent." (Appx27.) The analysis amounted to the District Court identifying one reference with multiple elements of Claim 1 of the '681 patent and then canvassing the asserted prior art to find the missing elements:

> The Clark Patent teaches all of the components of the apparatus Claim absent side-by-side foot bindings, and a plurality of rails protruding from the bottom surface of the riding board. . . . The Parten '000 Patent discloses side-by-side foot bindings disposed in the middle section of the top surface of the board, similar to the ones described in Claim 1. . . . [T]he Fryar Patent discloses a plurality of rails protruding from the bottom of the board that are disposed relative to the longitudinal axis, like those on the ZUP Board.

(Appx27-28.)

The District Court performed the same analysis for the other independent claim, claim 9 of the '681 patent:

> The Clark Patent discloses the claimed method of engaging a water recreation device with the exception of using side-by-side foot bindings. . . . The Parten '000 Patent teaches the use of side-by-side foot bindings and expressly anticipates riders moving between a prone, a kneeling, and a standing position while using the product.

(Appx28.)

The District Court then identified what must have happened: "It is evident to the Court that Duff [i.e., inventor of the '681 patent] identified known elements in the prior art that aided in rider stability while engaging a water recreational device and simply combined them in one apparatus and method." (Appx29.)

The District Court held that one of ordinary skill in the art would have been motivated to combine the same elements Duff did in 2008 "in order to aid in rider stability, to allow a wide variety of users to enjoy the device, and to aid users in maneuvering between positions on a water board." (*Id.*) "And the specific desire to aid users in maneuvering between positions on a water board has been a consistent motivation in the prior art for decades." (*Id.*)

"[T]he Court finds that ZUP has failed to establish either that a long-felt but unresolved need existed in the water recreational device industry or that its product somehow solved any such need." (Appx32.) The District Court reached this conclusion by rejecting ZUP's expert testimony opining that "'[t]he water-

recreation industry had failed over a 50-year period to innovate beyond providing riders stability within various pre-determined positions of tubing, kneeboarding, skiing, or wakeboarding.'" (Appx31.) The District Court also rejected ZUP's argument that Nash, having been an active participant in the industry for 50 years and having enthusiastically accepted and adopted the ZUP product, demonstrated long-felt-but-unresolved need. (*Id.*)

The District Court held that ZUP had failed to establish copying as a secondary consideration: "ZUP has provided no evidence that Nash attempted to independently create the device described in the '681 Patent and failed." (Appx33.)

Finally, the District Court held that ZUP failed to establish commercial success as a secondary consideration: "This evidence [i.e., ZUP sales figures], alone, is insufficient for the Court to make a determination that ZUP has experienced commercial success." (Appx34.)

***No Contributory Infringement***

The District Court held that "ZUP has provided no evidence of direct infringement." (Appx36.) Citing evidence submitted by Nash showing that at least two Versa board users kept the side-by-side handles on the board while riding in a skiing position, however, the District Court reasoned, "since a jury could reasonably conclude that a hypothetical consumer using the Versa Board 'more likely than not' used the product in a way that infringed Claim 9 of the '681 Patent,

the Court will proceed with its analysis." (Appx37.)

The District Court held that the Versa board is incapable of contributory infringement as a matter of law because it "can be used in multiple ways that, at most, are 'equally capable and interchangeably capable of both infringing and substantial non-infringing uses.'" (Appx41 (quoting *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1338 (Fed. Cir. 2012).)

## SUMMARY OF THE ARGUMENT

ZUP respectfully requests that the Court reverse the District Court's summary judgment invalidating the '681 patent for two reasons, either one of which would support reversal. First, the District Court's obviousness analysis lacks a rational underpinning of clear-and-convincing evidence showing why one of ordinary skill in the water recreation arts would have in 2008 combined prior art references containing a board with a tow hook, side-by-side handles, and foot bindings, all to facilitate simultaneous engagement by a rider who could move from prone to kneeling to crouching to standing positions. Unmoored from this rational underpinning required by law, the District Court's analysis amounts to a judge in 2017 reading the prior art and finding each element to collectively make what the '681 patent claims.

The other reason that would support reversal of the obviousness holding:

Nash produced no evidence of secondary considerations. Nash's expert opined that the '681 patent is invalid, but reached this conclusion without uttering a word about the objective indicia of possible non-obviousness. In contrast, ZUP came forward with evidence of secondary considerations, including an expert who opined on the long-felt-but-unresolved need for a water recreation device with components that could be simultaneously engaged so that more riders could obtain a skiing position while being towed by a boat. The District Court was faced with no evidence from Nash and, instead of construing the record in ZUP's favor, rejected the only evidence of record on secondary considerations.

The District Court found an erroneous "substantial non-infringing use." This Court has recognized that a competitor may not bundle non-infringing components in a product that also contains components that are good for nothing but infringement. That is precisely what the District Court has allowed Nash to do here. The infringing Versa board may be configured so that the board contains a tow hook, side-by-side handles, and side-by-side foot bindings—configured to infringe. It is no answer to ZUP's charge of infringement, though, for Nash to say that the Versa board *could* be configured to not infringe. Nash sells a product that is adapted to infringe the '681 patent.

# ARGUMENT

## Standard of Review

"A district court's grant of summary judgment is reviewed without deference, reapplying the same standard as the district court." *Ricoh Co., Ltd.*, 550 F.3d 1325, 1331 (Fed Cir. 2008).

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "In deciding whether summary judgment was appropriate, we view the evidence in a light most favorable to the party opposing the motion with doubts resolved in favor of the opponent . . . ." *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309, 1315 (Fed. Cir. 1998).

### I. THE DISTRICT COURT FAILED TO SUPPORT ITS OBVIOUSNESS HOLDING WITH CLEAR-AND-CONVINCING EVIDENCE OF A MOTIVATION TO COMBINE THE ASSERTED PRIOR ART AND ALSO IMPROPERLY SHIFTED THE BURDEN OF PROVING NON-OBVIOUSNESS TO ZUP.

Summary judgment in favor of Nash based on obviousness should be reversed for two independent reasons. First, the District Court's obviousness analysis is hindsight defined. The lower court uses the '681 patent as its guide on an adventure through the prior art, picking up pieces here and there that fit aspects of the invention. What the District Court's analysis lacks is what the law requires—clear and convincing evidence demonstrating why one of ordinary skill

in the art would have in 2008 combined the references to come up with the '681 patent.

Second, Nash submitted nothing but attorney argument regarding secondary considerations. That was also reversible error.

### A. The District Court's Obviousness Finding Lacks the Required Rational Underpinning Demonstrating Why the References Would Have Been Combined In 2008.

The lower court came right out and said what its obviousness analysis entailed: "It is evident to the Court that Duff [i.e., inventor of the '681 patent] identified known elements in the prior art that aided in rider stability while engaging a water recreational device and simply combined them in one apparatus and method." (Appx29.) That is, in 2017, the District Court canvassed the prior art and pieced together the required elements of the '681 patent claims.

"Our case law makes clear that the best defense against hindsight-based obviousness analysis is the *rigorous application* of the requirement for a showing of a teaching or motivation to combine the prior art references." *Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1371 (Fed. Cir. 2000) (emphasis added); *see also InTouch Tech., Inc. v. VGO Comm'cns, Inc.*, 751 F.3d 1327, 1347 (Fed. Cir. 2014) ("It appears that [the defendant's expert] relied on the [patent-in-suit] itself as her roadmap for putting what she referred to as pieces of a 'jigsaw puzzle' together.").

As in this case, in *Ecolochem*, the lower court "d[id] not discuss any specific evidence of motivation to combine, but only makes conclusory statements." *Id.* at 1372. There, the lower court interpreted the prior art references, and in reversing the lower court's summary judgment regarding obviousness, this Court held: "[W]hile these references teach the leaching of dissolved contaminants by activated carbon and the use of ion-exchange resins to remove carbon contaminants, neither reference suggests combining, nor provides any motivation to so combine, the two elements of the Ecolochem process . . . ." *Id.* at 1373. "This reference-by-reference, limitation-by-limitation analysis wholly fails to demonstrate how the prior art teaches or suggests the combination claimed in the '411 patent." *Id.* at 1374.

Here, the District Court declined to rely on Nash's expert and instead interpreted the prior art references as including the motivation to combine: "one of ordinary skill in the art would have been motivated in 2008 to combine these elements in order to aid rider stability, to allow a wide variety of users to enjoy the device, and to aid users in maneuvering between positions on a water board." (Appx29.) As in *Ecolochem*, the asserted references may have contained some of the elements of the '681 patent, but none contains the teaching or suggestion to combine these elements for simultaneous engagement by the user.

The record at the patent office and in the District Court establishes that an age-old motivation in this field is providing rider stability. For example, during prosecution, the examiner rejected a broader version of the '681 patent claims by combining the foot bindings of Echols: "Such a modification would have been desirable so as to enhance the stability of the rider and board as is *old and well known in the art*." Appx283 (emphasis added); *see also* Appx426 (Parten Decl.) ¶ 17 ("These modifications would have been desirable so as to enhance the stability of the rider and the board in a variety of riding positions and are old and well known in the art."); Appx457 (Garris Decl.) at 21 ("[A] person of ordinary skill in the art would certainly be concerned about the stability of the board and would be motivated to combine Echols and Fryar.").)

None of the references the District Court relied on to invalidate the '681 patent contains a suggestion to combine elements that lend a rider stability so that the rider may *simultaneously engage the elements to achieve a skiing position*. For example, Clark discloses a recessed two hook that allows the rider to more easily kneel, but there is no suggestion of side-by-side handles or foot bindings that the rider could use to crouch and then stand. (*See generally* Appx530-35 (U.S. Patent No. 5,163,860 – Clark).) Simultaneous engagement of the elements, however, is why the examiner allowed the claims:

> Applicant argues the combination of Echols and Fryar fails to provide side by side foot bindings and handles configured for *simultaneous*

> *engagement* as now proposed. Such would appear to define over the rejection based upon the above noted references, but could be considered a New Issue after final.

(Appx270 (emphasis added).)

That factual determination by examiner that the prior art failed to disclose or teach components for simultaneous engagement is entitled to deference. *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011). And the District Court's opinion is not supported by clear and convincing evidence to overcome the presumption that the prior art fails to teach or suggest simultaneous engagement to ease the burden of rising to a standing position from laying prone on the board.

### B. Nash Produced No Evidence On Secondary Considerations and the District Court Improperly Placed the Burden On ZUP to Prove Non-Obviousness.

Nash supported its summary judgment motion with the expert opinion testimony of Dr. Garris that the '681 patent is invalid as obvious. (Appx435) Dr. Garris, however, offered no opinion regarding secondary considerations. *InTouch Tech., Inc.*, 751 F.3d at 1352 ("By failing to account for objective evidence of nonobviousness, Dr. Yanco's analysis was incomplete, and ultimately insufficient to establish obviousness by clear and convincing evidence.").

The District Court improperly placed the burden on ZUP to prove non-obviousness: "[T]he Court finds that ZUP has failed to establish either that a long-felt but unresolved need existed in the water recreational device industry or that its

product somehow solved any such need." (Appx32.) The District Court may find prima facie obviousness, of course, but that does not "lessen or otherwise affect the burden of proof, nor does it require that unless the patentee introduces evidence of secondary considerations to establish non-obviousness, the patent challenger will necessarily prevail." *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1360 (Fed. Cir. 2007).

ZUP came forward with evidence of secondary considerations that was simply rejected by the District Court, notwithstanding Nash's total failure to introduce any evidence. First, ZUP submitted the expert opinion of James Emmons, as well as the actions of Nash, to establish a long-felt-but-unresolved need. Emmons, based on a long, diverse, and successful career in the industry, opined, "For over 50 years, advances in the watersports market focused on creating stability for a rider strictly within one of the three segments (tubing, kneeboarding, or skiing/wakeboarding." (Appx414 ¶ 16.) "[I]t was a general frustration to the industry that there was no product that would enable the weakest and most athletically challenged members of the boating community to ski or wakeboard." (*Id.* ¶ 15.) ZUP corroborated this evidence with Nash's enthusiastic acceptance and adoption of the ZUP board. (Appx139.) And Nash was a full participant in this stagnation, for 50 years churning out patents and products that did no more than provide stability within these confined positions. (Appx418 ("Nash has been an

industry leader for over 50 years.").) Nash's own enthusiastic acceptance of the ZUP board's novel simultaneous engagement of components so riders could more easily get up out of the water demonstrates long felt need: "Think you are spot on with Wally Weekender. Same guy that rides a kneeboard and tube. Want to be able to do it the first time every time." (Appx139.)

ZUP also submitted evidence that Nash copied the ZUP board, which the District Court actually acknowledges in its opinion: "[I]t is feasible for a user to ignore those instructions and attach both the handles and the foot bindings in a configuration that is nearly identical to the ZUP Board." (Appx7.)

## II. ZUP COULD PROVE THAT THE VERSA BOARD CONTRIBUTORILY INFRINGES THE '681 PATENT BECAUSE THE VERSA BOARD INCLUDES COMPONENTS THAT CAN ONLY BE USED TO INFRINGE.

The Versa board can be configured so that it would be good for nothing but infringing: https://youtu.be/bIIkbIkVui8.

Again, the District Court recognized this: "[I]t is feasible for a user to ignore those instructions and attach both the handles and the foot bindings in a configuration that is nearly identical to the ZUP Board." (Appx7.)

Based on this finding, the District Court should have applied *Ricoh Co., Ltd. v. Quanta Computer Inc.*, 550 F.3d 1325 (Fed. Cir. 2008), and held that the Versa board could contributorily infringe the '681 patent. In that case, this Court reversed summary judgment for the defendant where the defendant sold a product

containing an infringing microcontroller but embedded the infringing microcontroller in a larger product with noninfringing components. *Id.* at 1337. This Court held that a separable noninfringing component could *not* support "substantial noninfringing use"; otherwise, "A competitor who wished to sell hardware that would enable infringement of a patented process could do so without incurring liability for contributory infringement by selling a device that simply embedded the hardware for practicing the patented process within other hardware that also performs another process." *Id.* at 1337-38.

Applying *Ricoh* here, Nash does not have a "substantial noninfringing use" defense. The Versa board has a tow hook, side-by-side handles, and side-by-side foot bindings. (*See supra* at 13.) The Versa board is especially adapted to infringe claim 9 of the '681 patent. (*Id.*) It is no defense for Nash to embed separable elements that may not infringe. *Ricoh*, 550 F.3d at 1338.

*In re Bill of Lading Trans. and Processing Sys. Patent Litig.*, 681 F.3d 1323 (Fed. Cir. 2012) does not support Nash. There, this Court distinguished *Ricoh*, holding that the plaintiff alleged that the whole accused product—not components of a product—had noninfringing uses. *Id.* at 1338. It was not a case like *Ricoh*, where "'at least some distinct and separate components [were] used only to perform the allegedly infringing write methods.'" *Id.* (quoting *Ricoh*). Similarly, the Versa board contains a tow hook, side-by-side handles, and side-by-side foot

bindings that could only be used to infringe claim 9 of the ‘681 patent. It is no defense for Nash to point to separable components that do not infringe.

## CONCLUSION

This Court should reverse the judgment of the District Court.

Date: April 10, 2017

*/s/ Matthew M. Wawrzyn*
Matthew M. Wawrzyn
WAWRZYN & JARVIS LLC
2700 Patriot Boulevard, Suite 250
Glenview, IL 60026
(847) 656-5864
*matt@wawrzynlaw.com*

*Counsel for Plaintiff-Appellant ZUP, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 10, 2017, an electronic copy of the foregoing Brief of Plaintiff-Appellant was filed with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the CM/ECF system and thereby causing a "Notice of Electronic Filing" to be served on all counsel of record.

*/s/ Matthew M. Wawrzyn*
Matthew M. Wawrzyn

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Federal. The brief contains 6,052 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5)(A) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman.

*/s/ Matthew M. Wawrzyn*
Matthew M. Wawrzyn

**TABLE OF CONTENTS TO ADDENDUM**

Memorandum Opinion Granting Defendant's Motion for Summary Judgment Docket No. 57 (January 13, 2017) .................................................................. Appx1

U.S. Patent No. 8,292,681........................................................................... Appx48

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

FILED
JAN 13 2017
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

| | | |
|---|---|---|
| ZUP, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:16-CV-125–HEH |
| | ) | |
| NASH MANUFACTURING, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**
**(Granting Defendant's Motion for Summary Judgment)**

Plaintiff ZUP, LLC ("ZUP" or "Plaintiff") brings suit against Defendant Nash Manufacturing, Inc. ("Nash" or "Defendant") after a proposed business deal for a joint manufacturing venture turned sour. Both ZUP and Nash manufacture water recreational devices, with the former being a relative newcomer to the industry and the latter having worked in the area for over fifty years.

ZUP entered the market in 2012 with the introduction of its "ZUP Board," patented as U.S. Patent No. 8,292,681 (the "'681 Patent"). A year later, ZUP and Nash began discussions about a potential partnership, which eventually dissipated. Soon thereafter, Nash brought its "Versa Board" to market.

In response to Nash's new product, ZUP filed the present suit alleging four counts: contributory infringement of the '681 Patent (Count I); inducement of infringement of the '681 Patent (Count II); trade secret misappropriation (Count III); and breach of contract (Count IV). Nash brought two counterclaims against ZUP, seeking declaratory relief

regarding non-infringement (Counterclaim I) and declaratory relief regarding invalidity of the apparatus and method claims—Claims 1 and 9 respectively—of the '681 Patent (Counterclaim II).

This matter is currently before the Court on Nash's Motion for Summary Judgment, filed on September 14, 2016. (ECF No. 35.) Both parties filed memoranda supporting their respective positions. Oral argument followed on November 16, 2016.

For the reasons discussed herein, the Court will grant the Motion as to Defendant's Counterclaim II—rendering Counts I and II of Plaintiff's Complaint and Defendant's Counterclaim I moot—and as to Counts III and IV of Plaintiff's Complaint. Consequently, this case will be dismissed with prejudice.

## I. BACKGROUND

As required, the Court resolves all genuine disputes of material fact in favor of the non-moving party and disregards those factual assertions that are immaterial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Applying this standard, the Court concludes that the following narrative represents the facts for purposes of resolving the Motion for Summary Judgment.

In or around 2008, Glen Duff, ZUP's Chief Innovative Officer, and his wife bought a boat and joined a local water skiing club. (Compl. ¶ 12; ECF No. 1.) Through their volunteer activities with their church, the Duffs took groups of kids on their boat to teach them how to water ski and wakeboard. (*Id.* ¶ 13.) During these outings, Glen Duff noticed how difficult it was for many of the children to fully engage the water recreational devices. (*Id.*) As a result, he decided to develop a new product that would

"allow any kind of rider, regardless of athleticism or amount of upper body strength, to get up and achieve a full standing and riding position." (*Id.*) Over the next four years, Duff and others tested various board designs until they developed a working prototype of the ZUP Board. (*Id.* ¶ 15.) This new board allows riders "to transfer easily from a prone position, to a kneeling position, to a full upright standing position," thereby permitting "the widest spectrum of riders the most opportunity of experience." (*Id.* ¶¶ 14, 16.)

The ZUP Board has a top surface and a bottom surface, two side-by-side foot bindings located on the middle section of the board, two side-by-side handles on the front section of the board, and a retractable tow hook attached to the front section of the board. *See generally* U.S. Patent No. 8,292,681. Riders are instructed to grasp the handles and lie flat on the board in a prone position. The retractable tow hook is attached to a tow rope, which is in turn pulled by a boat. As the boat picks up speed, riders pull themselves up on the board and assume a kneeling position. Then riders crouch on the board, still grasping the handles for stability, and eventually place both feet in the side-by-side foot bindings displaced on the middle section of the board. Riders finally release their grip from the handles and then grasp the tow rope bar and disengage it from the retractable tow hook on the board as they assume a full upright standing position.

While developing a working prototype of the new device, Duff arduously fought to secure a patent for his new design, which he finally obtained on October 23, 2012. *Id.* The '681 Patent includes twelve (12) total Claims, with Claim 1 covering the apparatus and Claim 9 covering the method for using the ZUP Board. *Id.* at Claims 1, 9.

In September 2012, one month prior to the issuance of the '681 Patent, ZUP

formally introduced its new product at the Surf Expo, a trade show for the water sports industry. (Compl. ¶ 17.) At some point during the spring of 2013, Nash became aware that ZUP had entered the industry and saw the ZUP Board for the first time. (App. 255 ¶ 4.)[1]

Nash has been in the water recreational device industry for over fifty years and "has designed and manufactured . . . water skis, knee boards, wake boards and other similar devices, and has sold these products to a variety of sporting goods retailers, including Bass Pro Shop, Academy Sporting Goods, Dick's Sporting Goods, Big Five Sporting Goods and others." (Mem. in Supp. of Mot. for Summ. J. 2.) Nash's president, Keith Parten, is the named inventor for several patents, including an aquatic recreational system with a retractable tow hook (U.S. Patent No. 7,530,872 B2), a retractable tow hook (U.S. Patent No. 7,537,502), a water recreation board with a pass-through tow rope (U.S. Patent No. 6,042,439), a towing harness for water recreational boards (U.S. Patent No. 6,306,000), a design of a wake ski (U.S. Design Patent No. D557,635), a design of a towed inflatable device (U.S. Design Patent No. D650,462), and a method for manufacturing a skate board (U.S. Patent No. 921,513).

An initial round of conversations between the two parties concerning a potential manufacturing deal took place in the fall of 2013. (*See* App. 271.) Before engaging in serious discussions, it appears that ZUP requested that the parties enter into a confidentiality agreement. (*See id.*) Parten questioned the necessity of such a contract on

[1] Nash attached a 567-page appendix to its Memorandum in Support of its Motion for Summary Judgment. ZUP also attached a supplemental appendix to its Response, where it continued the numbering from Nash's appendix. The Court will consider both appendices as one document and will cite to the appendix generally.

September 18, 2013, noting that "[w]e just need a sample so we can quote you a price to build your item. I assume we could just order one . . . ." (*Id.* (ellipses in original).) Without signing the agreement, Nash obtained a sample of the board. (*See id.* at 272.) On December 10, 2013, Parten determined that Nash would "[n]ever do this item" and sent the board back to ZUP. (*Id.*)

Nevertheless, a little more than one month later, Parten reached out to Duff on January 31, 2014, "to talk . . . regarding production and distribution of [the] ZUP board." (*Id.* at 451.) Before meeting with Nash to discuss the possibility of entering into a manufacturing and distribution partnership or potential sale of the company, ZUP again required Nash to execute a confidentiality agreement, which it did on February 5, 2014. (*Id.* at 273–75.) After the agreement was signed, ZUP asserts that it provided Nash "with confidential and proprietary information, including, but not limited to, information regarding: (a) ZUP's vendors; (b) component costs and materials; (c) patent information; (d) marketing plans and strategies; (e) retailer arrangements and contacts; (f) new design concepts and materials; (g) ZUP's intellectual property development and enforcement strategies; and (h) ZUP's proprietary roto-molded 3D computer designed model." (Compl. ¶ 57.)

On February 5, 2014, the same day that the parties entered into the confidentiality agreement, representatives from ZUP and Nash held a telephone conference about the proposed deal. (*See generally* App. 568–72.) During the meeting, Parten allegedly told ZUP's representatives that they "had a great product" and noted that Nash "ha[d] no intentions in the next few years of doing anything that has any resemblance to the ZUP

Board." (*Id.* at 568, 572.) Also during that conversation, Nash inquired about the issuance of the '681 Patent. (*Id.* at 572 ("Will your patent hold up against [another competitor's] new product[?]").)

Two days later, on February 7, 2014, Parten sent Duff an email with several questions regarding three Claims in the '681 Patent.[2] (*Id.* at 462.) In response, ZUP spoke with its patent attorney and forwarded the responses to Nash. (*Id.* at 461.) The scope of the patent attorney's advice was explaining the difference between independent and dependent patent claims. (*See id.*)

At the same time that he posed these questions to Duff, Parten asked Nash's patent attorney, Eric Karich, to look at the '681 Patent, specifically asking "[h]ow can this be issued?" (*Id.* at 306.) Karich responded, "It is supposedly an improvement over other such boards, the claims are quite narrow." (*Id.*) Parten and the attorney later spoke by phone, and Parten asked whether Nash's proposed Versa Board would infringe the '681 Patent. (*Id.* at 259 ¶ 11.) Karich told Parten that Nash's new product would not infringe, and later memorialized that opinion in writing on October 6, 2014. (*Id.* at 307–13.)

In the meantime, discussions between Nash and ZUP ended without reaching an agreement. (*See id.* at 464–86.) And in May 2014, Nash brought its new product, the Versa Board, to market. (*Id.* 256 ¶ 8.)

Like the ZUP Board, the Versa Board has a top surface and a bottom surface, with a retractable tow hook disposed on the front section of the board. On the top surface of

---

[2] Significantly, none of the questions concerned either Claim 1 or Claim 9, which are at issue in this case. (*See* App. 462.)

the board, there are several holes configured in different patterns. Users are instructed to attach handles or foot bindings in these holes in one of four configurations. In the first configuration, users can choose not to attach either the handles or the foot bindings to the board and use it for "wakeskating" or surfing. (Mem. in Supp. of Mot. for Summ. J. 30.) In the second, users can choose to attach only the foot bindings to the board in a side-by-side, horizontal configuration, allowing the user to water ski. (*Id.*) In the third configuration, users can choose to attach only the foot bindings to the board in a vertical configuration so they can wakeboard. (*Id.* at 29.) And in the fourth instructed configuration, users can choose to attach only the handles to the Versa Board so they can use it for kneeboarding. (*Id.* at 31.)

Nash instructs its customers to only use the product in these four ways and specifically warns against leaving the handles attached while standing up on the board. (Mem. in Supp. of Mot. for Summ. J. 33–34; *see also* App. 387–88.) Nevertheless, it is feasible for a user to ignore those instructions and attach both the handles and the foot bindings in a configuration that is nearly identical to the ZUP Board.

In September 2014, Nash unveiled its Versa Board at the 2014 Surf Expo. (Compl. ¶ 23.) During the event, Duff approached Parten and expressed his concern that Nash's product infringed on the '681 Patent. (Duff. Decl. ¶ 7.) In response, Parten allegedly told him to "get over it" and said that patents are meaningless in the water recreation industry. (*Id.*) Nevertheless, Duff reached out to Parten one more time in an attempt to secure a manufacturing or distribution deal and to avoid litigation. (App. 487, 489.) This last-ditch effort bore no fruit.

As a result, ZUP brought suit on March 1, 2016, and Nash filed its Answer and Counterclaims on May 5, 2016. Upon reviewing the Complaint and counterclaims, the Court finds that it has original jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1338(a), and 1367(a).

After extensive discovery, Nash filed the present Motion for Summary Judgment on September 14, 2016. (ECF No. 35.)

## II. LEGAL STANDARD

The analytical framework for reviewing motions for summary judgment is well settled in both the Fourth and Federal Circuits.[3] Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The relevant inquiry in a summary judgment analysis is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. In reviewing a motion for summary judgment, the Court must view the facts in the light most favorable to the non-moving party. *See id.* at 255; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 597 (1986).

The party seeking summary judgment has the initial burden of showing an absence of a material fact in dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). To

[3] The Federal Circuit applies its own law with respect to issues of substantive patent law and procedural issues pertaining to patent law. "For issues not unique to patent law, [the Federal Circuit] appl[ies] the law of the regional circuit in which [the case] would otherwise lie." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 841 (Fed. Cir. 2010).

defeat summary judgment, the nonmoving party must go beyond the mere pleadings and provide affidavits, depositions, interrogatories, or other evidence to demonstrate that there is in fact a genuine issue for trial. *Id.* at 324. If a party who bears the burden of proof at trial fails to come forward with sufficient evidence to establish the existence of an element essential to that party's case, summary judgment should ordinarily be granted. *Anderson*, 477 U.S. at 248.

This methodology is applied in a similar fashion to patent infringement cases. To prevail, the party claiming infringement must establish that the accused product meets every limitation recited in the accused claim, either literally or under the doctrine of equivalents. *V-Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1310 (Fed. Cir. 2005); *Lifescan, Inc. v. Home Diagnostics, Inc.*, 76 F.3d 358, 359 (Fed. Cir. 1996).

Challenges to the validity of a patent, however, face a higher burden of proof. Noting nearly a century of seamless jurisprudence, the United States Supreme Court stated in *Microsoft v. i4i Limited Partnership* that "there is a presumption of [patent] validity [that is] not to be overthrown except by clear and cogent evidence." 564 U.S. 91, 101 (2011) (citations omitted). In order to prove invalidity, the movant "must submit such clear and convincing evidence of invalidity so that no reasonable jury could find otherwise." *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 962 (Fed. Cir. 2001).

## III. DISCUSSION

### A. Claims 1 and 9 of the '681 Patent Are Invalid Due to Obviousness

Congress has stated that "[an issued] patent shall be presumed valid." 35 U.S.C. §

282(a).[4] Pursuant to this direction, Congress has also provided that "[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims." *Id.*

In challenging the validity of Claims 1 and 9 of the '681 Patent—both of which are independent claims—Nash cites Section 103 of the Patent Act, which forbids the issuance of a patent where "the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. §103(a).

The Supreme Court clarified the analysis trial courts are to use when assessing a Section 103 claim of obviousness in *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007). In that case, the Supreme Court held that "[t]he ultimate judgment of obviousness is a legal determination," *id.* at 427, to be assessed based on several underlying factual findings, including: (1) "the level of ordinary skill in the pertinent art" at the time of the invention; (2) "the scope and content of the prior art"; (3) the "differences between the prior art and the claims at issue"; and (4) objective evidence of nonobviousness such as commercial success, long felt but unsolved needs, evidence of acclaim from the inventor's peers, and the failure of others to innovate. *Id.* at 406 (quoting *Graham v.*

---

[4] ZUP argues that the "factual determination [that Claim 1 was patentable over the prior art] made by the examiner is entitled to deference." (Resp. to Mot. for Summ. J. 21.) While this is true, the Federal Circuit has held that such deference "takes the form of the presumption of validity under 35 U.S.C. § 282." *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1359 (Fed. Cir. 2007). Therefore, while the existence of uncited prior art does not weaken the presumption, it does "make[] it easier for the party challenging the validity of the patent to carry its burden of proof. *Alco Std. Corp. v. Tennessee Valley Auth.*, 808 F.2d 1490, 1497 (Fed. Cir. 1986).

*John Deere Co. of Kansas City*, 383 U.S. 1, 17–18 (1966)); *see also Eli Lilly & Co.*, 619 F.3d at 1336; *Rolls-Royce, PLC v. United Technologies Corp.*, 603 F.3d 1325, 1338 (Fed. Cir. 2010).

This Court has previously held that "[t]he determinative question" in assessing a claim of obviousness "is whether 'one of ordinary skill in the art would have been motivated to use the teachings of a prior art process, in its normal disclosed operation, to create a product that [he] claims in a subsequent patent." *Rutherford Controls Int'l Corp. v. Alarm Controls Corp.*, Civ. Action No. 3:08CV369-HEH, 2009 WL 3423849, at *8 (E.D. Va. Oct. 23, 2009) (alteration in original) (quoting *LNP Eng'g Plastics, Inc. v. Miller Waste Mills, Inc.*, 275 F.3d 1347, 1359 (Fed. Cir. 2001)). "The question is not whether the combination was obvious to the patentee but whether the combination was obvious to a person with ordinary skill in the art." *KSR*, 550 U.S. at 420.

Therefore, the Court will assess the four *KSR* factors in determining whether Claims 1 and 9 of the '681 Patent are invalid due to obviousness.[5]

**i. The level of ordinary skill in the pertinent art**

Nash has proposed that one of ordinary skill in the art 2008 was "a person with at least 3-5 years' experience in the design and manufacture of water recreational devices or ha[s] a bachelor's degree in mechanical engineering." (App. 259 ¶12; App. 518.) ZUP does not dispute this definition. (Resp. to Mot. for Summ. J. 14.)

---

[5] The Federal Circuit has affirmed trial courts' usage of the *KSR* factors when invalidating patents due to obviousness on summary judgment on multiple occasions. *See, e.g.*, *Ohio Willow Co. v. Alps South, LLC*, 735 F.3d 1333 (Fed. Cir. 2013); *Odom v. Microsoft Corp.*, 429 F. App'x 967 (Fed. Cir. 2011).

Because the parties are in agreement, the Court will treat this factual finding as undisputed.

**ii. The scope and content of the prior art**

Before discussing the scope and content of the prior art, the Court finds it necessary to provide some context by detailing the Claims that Nash is challenging on obviousness grounds.

Claim 1 of the '681 Patent—the apparatus claim—teaches a water recreation device comprising:

> a riding board having a top surface, a bottom surface, a front section, a middle section, and a rear section;
>
> a tow hook disposed on the front section of the riding board;
>
> first and second handles disposed side-by-side on the front section of the top surface of the riding board aft of the tow hook;
>
> first and second foot bindings disposed side-by-side on the middle section of the top surface of the riding board aft of the first and second handles; and
>
> a plurality of rails protruding from the bottom surface of the riding board and extending substantially the full length of the riding board:
>
> wherein the tow hook includes a rearward-facing concave section sized to receive a tow rope bar and positioned to allow the riding board to be pulled in a forward direction by a tow rope attached to the tow rope bar,
>
> wherein the first and second handles and the first and second foot bindings are configured for simultaneous engagement by a rider to position the rider in a crouching stance facing in a forward direction,
>
> wherein the plurality of rails are disposed relative to a longitudinal axis along the bottom surface of the riding board, the longitudinal axis projecting rearwardly from a reference location substantially central to the front section, and each of the plurality of rails is laterally spaced closer to the longitudinal axis nearest the rear section of the riding board than the

> [*sic*] each of the plurality of rails is laterally spaced from the longitudinal axis nearest the front section of the riding board thereby allowing the water that moves across the bottom surface nearest the front section of the riding board to funnel towards the bottom surface nearest the rear section of the riding board for the purpose of generating lift force against the bottom surface of the riding board.

Claim 9 of the '681 Patent—the method claim—teaches a method of riding the apparatus described in Claim 1 by:

> placing a water recreation device into a body of water, the water recreation device comprising:
>
>> a riding board having a top surface, a bottom surface, a front section, a middle section, and a rear section;
>>
>> a tow hook disposed on the front section of the riding board;
>>
>> first and second handles disposed side-by-side on the front section of the top surface of the riding board aft of the tow hook; and
>>
>> first and second foot bindings disposed side-by-side on the middle section of the top surface of the riding board aft of the first and second handles;
>
> attaching a tow rope to said tow hook, said tow rope also attached to a water vehicle;
>
> grasping the first and second handles of the water recreation device to establish a prone start position by a rider;
>
> maintaining said prone start position by the rider until the riding board has achieved a substantially parallel position relative to the surface of the water;
>
> achieving a kneeling position by the rider by placing both knees on the top surface of the riding board;
>
> achieving a crouching position by the rider by placing a first foot into the first foot binding and then placing a second foot into the second foot binding;
>
> grasping the tow rope by the rider by releasing the first and second handles;

removing the tow rope from the tow hook by the rider;

standing on the riding board by the rider while continuing to grasp the tow rope.

Having set out the specific Claims, the Court will now shift its focus to the scope and content of the prior art at the time the '681 Patent issued.

"'Prior art' in the obviousness context includes the material identified in [35 U.S.C.] section 102(a)." *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1305 (Fed. Cir. 2006) (citing *Riverwood Int'l Corp. v. R.A. Jones & Co.*, 324 F.3d 1346, 1354 (Fed. Cir. 2003)). Section 102(a) defines prior art as inventions that were "patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention," which in this case was December 2, 2008.[6] 35 U.S.C. § 102(a)(1). "Art that is not accessible to the public is generally not recognized as prior art." *Ormco*, 463 F.3d at 1305 (citing *Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1301 (Fed. Cir. 2002); *OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1402 (Fed. Cir. 1997)).

The parties have identified eleven examples of prior art for the Court to examine. The Court will address each in chronological order.

**a. Atlantic Aquatic Stunt Team Board (1938–47) ("Atlantic Aquatic Reference")**

Nash alleges that ZUP neglected its duty to disclose a photograph of the Atlantic Aquatic Reference—a device apparently in use between 1938 and 1947—with its patent

---

[6] ZUP initially filed its application for a patent of the ZUP Board on December 2, 2009 (App. 27), though it claimed the benefit of earlier priority based upon the filing of a provisional application one year earlier, on December 2, 2008. *See* Application No. 61/200,637 (filed on Dec. 2, 2008).

application, pursuant to 37 C.F.R. §1.56. (*See* Mem. in Supp. of Mot. for Summ. J. 20 n. 3, 20–21.) The picture of the Atlantic Aquatic Reference attached to Nash's Memorandum in Support of its Motion for Summary Judgment shows a water recreation device with side-by-side handles and side-by-side foot locators, both on the top side of the board. (*Id.* 21.)

The only evidence that Nash provided regarding the source of the photograph was an email attaching the image with the subject line reading "Photo from Nov. 6, 2013." (App. 314.) Nash did not clarify how it obtained the image at oral argument. Instead, it merely noted that it found the photograph on the internet.

As an initial matter, even if the Atlantic Aquatic Reference is admissible—which is a point of contention between the parties—the Court has serious doubts as to whether it qualifies as prior art. Nash has provided no evidence that the Atlantic Aquatic Reference was "patented, described in a printed publication, or in public use, on sale, or otherwise available to the public" prior to December 2, 2008. 35 U.S.C. § 102(a). Moreover, since Nash was unable to provide a specific source for the picture, the Court is wary that the reference may "not [be] accessible to the public." *Ormco*, 463 F.3d at 1305.

Therefore, the Court will not address the Atlantic Aquatic Reference in its analysis.

**b. Schmitt, U.S. Patent 3,918,114 ("Schmitt Patent")**

The Schmitt Patent, issued on November 11, 1975, teaches a water ski with "a plurality of grooves which extend inwardly from each end a portion of the length of the ski." U.S. Patent No. 3,918,114, abstract (filed May 24, 1974). The skis have a top

surface and a bottom surface.

According to Figures 1 and 2, the grooves along the bottom surface of the skis are disposed relative to a longitudinal axis projecting rearwardly from a reference location substantially central to the front section. *Id.* at figs. 1, 2. In those Figures, the rails are spaced closely together at the longitudinal axis nearest the rear section of the riding board and fan out to the sides of the board as they move towards the front section. *Id.*

In the preferred embodiment of the board, the rails converge, unlike the rails taught in the '681 Patent. *See id.* However, the Schmitt Patent teaches that the front of the skis will be out of the water when in use, thereby leading the submerged rails to converge towards the rear of the board, like those on the ZUP Board. *Id.* at col. 1, ll. 53–65.

**c. Monreal, U.S. Patent No. 4,678,444 ("Monreal Patent")**

The Monreal Patent, issued on July 7, 1987, teaches a "Water Gliding Scooter Board" that is "intended to accommodate a rider gliding over water while towed from a speed boat by a tow-rope." U.S. Patent No. 4,678,444, abstract (filed Feb. 24, 1986). The patent depicts a board with a top surface and a bottom surface.

The device includes "a hard plastic hood" on the top surface of the board, which allows for improved versatility of use by permitting riders to engage in a low kneeling, high kneeling, or high sitting position. *Id.* at col. 1, ll. 39–43.

Two tow hooks—each of which can be engaged depending on the direction in which the user is riding the board—are disposed on the front section of the board. *Id.* at figs. 1–3, col. 3, ll. 11–22. The tow hooks include a rearward-facing concave section

sized to receive a tow rope. *Id.* at figs. 1–3. Additionally, the board has two sets of side-by-side foot bindings, disposed on the top surface of the board in the front and middle sections. *Id.*

**d. Clark, U.S. Patent No. 5,163,860 ("Clark Patent")**

The Clark Patent, issued on November 17, 1992, teaches a tow system for a water board. U.S. Patent No. 5,163,860, abstract (filed Aug. 27, 1991). The patent depicts a riding board with a top and bottom surface. The bottom surface "may be provided with conventional strakes or grooves to facilitate planing on the water or directional stability." *Id.* at col. 2, ll. 25–27. The top surface of the board has a recess for holding a tow rope handle as the board is being towed. *Id.* at col. 3, ll. 1–10.

According to the patent, the addition of this recessed tow hook allows a user to "lie prone on the board and grip the board with both hands as the towing operation begins. As the towing speed increases, the user may either remain prone, pull himself into a kneeling position, or rise to a standing position without worrying about holding the tow rope." *Id.* at col. 1, ll. 41–46. Additionally, there is a leash on the board that is attached to a bracket, which the user can grasp while kneeling or sitting on the board to aid in stability while riding on the water. *Id.* at col. 2, ll. 30–34.

This invention was motivated by a desire to assist users of all skill levels in achieving a riding position on kneeboards. *See id.* at col. 1, ll. 32–40.

**e. Echols, U.S. Patent No. 5,083,955 ("Echols Patent")**

U.S. Patent No. 5,083,955, entitled "Aquatic Recreational Towing Devices," issued on January 28, 1992. U.S. Patent No. 5,083,955 (filed Oct. 11, 1989). The

Echols Patent teaches a water recreation device with a top surface and a bottom surface. The board has a tow hook on its front section that engages a removable handle, which is connected to the tow rope. *Id.* at col. 5, ll. 35–57. The tow hook includes a rearward facing concave section sized to receive the tow rope. *See id.* at figs. 8–10.

Figure 1 shows foot bindings, although they are not configured in a side-by-side manner. *See id.* at fig. 1. And while the patent does not suggest the use of side-by-side handles like the '681 Patent, the rider is instructed to hold on to the board or the handle attached to the board—which in several embodiments is separate from the tow hook handle—with one or both hands "to stabilize himself" before fully engaging the tow hook handle to assume a standing or kneeling position. *Id.* at figs. 2, 3, 7–9, 12, col. 2, ll. 33–34, col. 4, ll. 21–22.

Referencing the same feelings of exclusion cited by Duff in the creation of the '681 Patent, Echols noted that he was motivated by a desire "to make it easier for a rider to initiate the towing and positioning of [kneeboards and ski boards] preparatory to riding and maneuvering them." *Id.* at col. 1, ll. 13–15, 28–38.

**f. Stewart, U.S. Patent No. 5,797,779 ("Stewart Patent")**

The Stewart Patent, issued on August 25, 1998, teaches a bodyboard with "a differentiated topskin" to aid in rider maneuverability and stability. U.S. Patent No. 5,797,779 (filed Feb. 8, 1996). The board has a top surface and a bottom surface.

Noting that "the rider's grip is extremely important to maintaining bodyboard control," *id.* at col. 1, ll. 38–39, the patent teaches the use of a "palm grip which provides a rider handhold" and a "palm well" to aid in "gripping the side edge of the bodyboard

core." *Id.* at col. 2, ll. 56–57, 62–63. The palm grips are "positioned adjacent in a forward corner of the board" and, in the preferred embodiment, "are raised and are given enhanced surface friction characteristics." *Id.* at col. 6, ll. 9, 11–12. The palm wells are located "just behind the palm grips," *id.* at col. 6, ll. 15, in order to provide the rider something to grasp on to for aided stability.

Though the "palm grip" and the "palm well" do not amount to side-by-side handles, like those found in the '681 Patent, the Court finds that they are functionally equivalent.

**g. Hornsby, et al., U.S. Patent 5,820,430 ("Hornsby Patent")**

The Hornsby Patent, issued on October 13, 1998, teaches an aquatic recreational device with a bifurcated hull to be used as a kneeboard by a pair of side-by-side riders. U.S. Patent No. 5,820,430, abstract (filed Oct. 10, 1997). The board has a top surface and a bottom surface.

According to figures 3, 4, and 6, there are a plurality of rails—channels and skegs—which are disposed relative to a longitudinal axis along the bottom surface of the riding board, the longitudinal axis projecting rearwardly from a reference location substantially central to the front section. *See id.* at figs. 3, 4, 6. These rails were an improvement over the then-existing prior art because they provided additional stability for riders as they attempt to engage the board. *See id.* at col. 1, ll. 35–37.

**h. Fleischman, U.S. Patent No. 5,979,351 ("Fleischman Patent")**

U.S. Patent No. 5,979,351, entitled "Towable Recreational Water Sled," issued on November 9, 1999. U.S. Patent No. 5,979,351 (filed May 2, 1998). The patent teaches a

"towable, flexible, unsinkable water sled for accommodating single or multiple riders." *Id.* at abstract.

The patent depicts a water recreation device comprising a flexible board having a top surface and a bottom surface. The image attached shows multiple handles secured to the front of the board "that allow the riders to hang on while being towed." *Id.* at col. 2, ll. 45–46; *see id.* at fig. 1. A review of the patent demonstrates that these handles are used for engaging the apparatus rather than to aid in rider stability, like those in the '681 patent.

Though used for different purposes, the Fleishmann Patent shows that the use of side-by-side handles attached to the front of a water recreational device was present in the prior art at the time the '681 Patent was issued.

**i. Parten, *et al.*, U.S. Patent No. 6,306,000 ("Parten '000 Patent")**

U.S. Patent No. 6,306,000, entitled "Towing Harness for Water Recreation Boards," issued on October 23, 2001. U.S. Patent No. 6,306,000 (filed Feb. 29, 2000). Invented by Keith Parten and assigned to Nash, the Parten '000 Patent teaches an "improved towing harness for use in combination with a water recreation device." *Id.* at abstract.

The patent depicts a water recreation device comprising a riding board with a top surface and a bottom surface. The claimed invention is a tow rope that is connected to the boat and passes through an eyelet in the front section of the board, which is then attached to a handle that users can either engage or leave stationary on the board. Several images depicting the patent's use contemplate riders in a variety of positions, such as

lying down, sitting, kneeling, or standing on the board. *See id.* at figs. 4–11. The patent clearly anticipates riders moving between these positions while the board is in use. *See id.* at col. 2, ll. 53–54 ("The rider may change positions while riding the board."), col. 6, ll. 18–44 (describing all of the positions in Claim 1 of the patent).

According to the Parten '000 Patent, the tow-rope configuration was already being utilized in a commercial product called the Ski Skimmer at the time of issuance. *Id.* at col. 5, ll. 33–34. The image of the Ski Skimmer attached to the patent shows a board with first and second side-by-side foot bindings disposed on the middle section of the top surface of the board, similar to those taught in the '681 Patent. *Id.* at fig. 14.

**j. Fryar, U.S. Patent No. 6,585,549 ("Fryar Patent")**

U.S. Patent No. 6,585,549, entitled "Momentum Induced Wakeboard Stabilization System," issued on July 1, 2003. U.S. Patent No. 6,585,549 (filed Apr. 2, 2002). The patent teaches a water recreation device comprising a riding board having a top surface and a bottom surface.

Along the bottom surface are a plurality of rails (vanes) that are disposed relative to the longitudinal axis of the board, projecting rearwardly from a reference location substantially central to the front section. *Id.* at fig. 1. These rails extend substantially the full length of the board. *See id.* Each of the plurality of rails is placed closer to the longitudinal axis near the rear side of the board than those placed near the front side of the board, allowing the water that moves across the bottom surface to funnel towards the rear section of the board for the purpose of generating lift force. *See id.* at fig. 7A; *see also id.* at col. 4, ll. 2–9 ("Figure 7A shows the flow of water over the generally planar

bottom surface in line with the longitudinal axis of the wakeboard. As the diagram shows, the water flowing over the interior van surfaces of the vanes is channeled towards the longitudinal axis of the wakeboard."). According to Nash's expert, Dr. Charles A. Garris, Jr., "[i]t is well known in the art that the flow of fluid on the bottom of the wakeboard has momentum that gives rise to lift forces according to Newton's Law of motion." (App. 523.)

The patent's inventor, Jared Fryar, claims that using this channeling system on a wakeboard "enhances the rider's control and hold while increasing the speed of the wakeboard around [a] turn." '549 Patent, col. 2, ll. 5–9.

**k. Parten, U.S. Patent No. 7,530,872 ("Parten '872 Patent")**

The final piece of prior art offered by the parties, the Parten '872 Patent, teaches an aquatic recreational device "configured for towing with a towline" and a method for riding it. U.S. Patent No. 7,530,872, abstract (filed Feb. 23, 2005). The patent issued on May 12, 2009. Also invented by Keith Parten, the patent depicts a kneeboard with a top surface and a bottom surface. It has a retractable tow hook disposed on the front section of the board. The tow hook includes a rearward-facing concave section to receive the tow rope bar and is positioned to allow the board to be pulled in a forward direction by the tow rope attached to the tow rope bar. *Id.* at figs. 2–4.

The apparatus contains straps on the board's midsection, preferably placed over the rider's thighs to secure the user to the board. *Id.* at fig. 6. Next to the straps are side-by-side recesses for the user's knees. *Id.*

Like the ZUP Board, the Parten '872 Patent was specifically invented to "aid[]

young, weak, or inexperienced riders in achieving proper riding body positioning on an aquatic recreational device." *Id.* at col. 2, ll. 49–51. The primary means of aiding those riders was to use and incorporate a retractable tow hook within an aquatic recreational device. *Id.* at col. 3, ll. 53–58.

Through its expert, Dr. Charles A. Garris, Jr., Nash asserts that the straps on the midsection of the board have the same function as the side-by-side handles on the ZUP board: to increase rider stability. (App. 520–21.) This position is a bit tenuous since it appears that the straps' primary purpose is to secure the rider to the board rather than to aid in stability. *See* '872 Patent, col. 5, ll. 18–19, 24–32.[7] However, Parten expressly contemplated using a "type of rigid bar, semi-rigid bar, or other suitable device" instead of straps to aid in stability. *Id.* at col. 5, l. 39. Therefore, the Court will treat the concept of using a rigid bar to aid in rider stability, like the side-by-side handles taught in the '681 Patent, as one contemplated by the prior art.

**iii. The differences between the prior art and the claims at issue**

To aid in its analysis of Claims 1 and 9 in view of the prior art, the Court will first recount the '681 Patent prosecution. The Court will then analyze the Claims at issue, whether they are obvious in light of the prior art, and whether someone of ordinary skill would have been motivated to combine the prior art references to create the apparatus and method described in the '681 Patent.

[7] "Kneeboard preferably comprises two straps adapted for releasable-interconnection with each other through the use of hook-and-loop type fastening materials. More specifically, the hook-type material is preferably permanently affixed to one strap and the loop type material is preferably permanently affixed to the other strap; however, straps may be releasably joined through the use of buckles, knots, or other suitable devices or means of releasably connecting the two straps." '872 Patent, col. 5 l. 24–32

Case: 17-1601 Document: 12 Page: 59 Filed: 04/10/2017


### a. Patent Prosecution

When initially filed, Claims 1 and 9 (formerly Claim 15) were much broader than those that were issued in the final '681 Patent. And so, during the initial patent prosecution, the examiner rejected all of the claims in the application. (App. 108.) Relevant to the present matter is the examiner's determination that Claim 1was anticipated by the Echols Patent and the Clark Patent, was obvious over the Monreal Patent in view of the Clark Patent, and was obvious over the Hornsby Patent in view of the Echols Patent. (*Id.* at 109–13.)

Additionally, the examiner initially rejected Claim 9 (formerly Claim 15) after finding that it was anticipated by the Clark Patent. (*Id.* at 109–10 ("Clark teaches the claimed method of riding a water recreation device, including the grasping of a handle (a handle is anything designed to be grabbed by hand, and in this instance, such does not define over the rail of the board), the removing of the tow rope from the deck attached hook, and the subsequent standing of the operator.").)

As a result, Duff amended Claim 1 by arguing that the rails on the ZUP Board are intended to provide lift as opposed to stability, like the ones contained in the Hornsby Patent. (*Id.* at 127.) Duff also amended Claim 9 (formerly Claim 15) to include side-by-side foot bindings, distinguishing them from the ones contained in the Monreal Patent. (*Id.* at 132.)

Upon receiving the amendments, the USPTO issued a final action, again rejecting all of the claims in the application. (*Id.* at 151.) The patent examiner noted that Duff's argument regarding the rails' intended use in comparison to the Hornsby Patent was

insufficient as "[t]he claimed lift is a characteristic of all rails and fins." (*Id.* at 153.) The examiner determined that Claim 1 was unpatenable as obvious over the Echols Patent in view of the Fryar Patent. (*Id.* at 153–54 ("Echols discloses the claimed invention with exception of the claimed protruding rails. . . . Fryar provides protruding rails on a bottom of a water recreation device.").) He also rejected Claim 1 as obvious over the Hornsby Patent in view of the Schmitt Patent and the Echols Patent. (*Id.* at 155–56 ("Hornsby . . . discloses the claimed invention with exception of a hook and handles and converging rails. . . . Schmitt teaches the angling of such rails such that they converge as they progress aft, thereby producing lift. . . . Echols . . . shows . . . a hook for engaging a tow line with a handle lying on the deck, or as noted above . . . a hook and a handle on the deck.").) Finally, the examiner rejected Claim 1 as being obvious over the Monreal Patent in view of the Fryar Patent and the Clark Patent. (*Id.* at 156–57 ("Monreal shows the claimed invention with exception of a handle and protruding rails. Clark . . . shows a handle." And Fryar provides protruding rails on the bottom of a water recreation device.).)

The patent examiner similarly rejected Claim 9 (formerly Claim 15) as being obvious over the Clark Patent in view of the Echols Patent and the Stewart Patent. (*Id.* at 158 ("Clark discloses the claimed method of riding with exception of using foot bindings and the grasping handles. . . . Echols teaches a board generally as that of Clark, with the provision of foot bindings. . . . Stewart teaches provision of handles in/on the top surface of a riding board.").)

Subsequent to the USPTO's final rejection of the patent application, Duff, through

his attorneys, reached out to the patent examiner for an informal telephone interview, which was held on June 7, 2012. (*Id.* at 163.) After the interview, the examiner issued a summary of their discussion where he noted that Duff's inclusion of "side by side foot bindings and handles configured for simultaneous engagement as now proposed . . . would appear to define over the rejection." (*Id.* at 167; *see also id.* at 177–78.)

Duff submitted a final round of amendments, which resulted in the issuance of the '681 Patent. (*Id.* at 246.) Duff then assigned the patent to ZUP. (*Id.* at 250.)

Significantly, throughout the entire patent prosecution, there is no evidence that the examiner referenced or contemplated the Fleischman Patent, the Parten '000 Patent, or the Parten '872 Patent.

**b. The prior art as it relates to Claims 1 and 9 of the '681 Patent**

The central elements of Claims 1 and 9 of the '681 Patent are: (1) a riding board with a top and bottom surface; (2) a tow hook dispensed on the front section of the board; (3) a plurality of rails protruding from the bottom surface of the riding board; (4) side-by-side handles disposed on the front section of the board; (5) side-by-side foot bindings disposed on the middle section of the board; and (6) the simultaneous use of the handles and foot bindings to achieve a standing position on the board.

Within the context of examining the prior art as it relates to Claims 1 and 9 of the '681 Patent, the Court notes that the Federal Circuit has held that "[a] claim can be obvious even where all of the claimed features are not found in specific prior art references, where 'there is a showing of a suggestion or motivation to modify the teachings of [the prior art] to the claimed invention.'" *Ormco*, 463 F.3d at 1307 (second

alteration in original) (quoting *SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.*, 225 F.3d 1349, 1356 (Fed. Cir. 2000)).

Additionally, the Supreme Court has stated that

> [w]hen there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense.

*KSR*, 550 U.S. at 421. In simpler parlance, "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *Id.* at 416.[8]

Through this lens, the Court finds by clear and convincing evidence that Claim 1 of the '681 Patent would have been obvious to an ordinary person skilled in the art over the Clark Patent in view of the Parten '000 Patent, the Parten '872 Patent, the Fleischman Patent, the Stewart Patent, and the Fryar Patent.

The Clark Patent teaches all of the components of the apparatus Claim absent side-by-side foot bindings, and a plurality of rails protruding from the bottom surface of the riding board. The Clark Patent discloses a board with a top surface and a bottom surface, a recessed tow hook, and a handle—as the patent examiner noted, "a handle is anything designed to be grabbed by hand." (App. 109–10.) The Parten '000 Patent discloses side-

[8] *But see KSR*, 550 U.S. at 418–19 ("[A] patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art. Although common sense directs one to look with care at a patent application that claims as innovation the combination of two known devices according to their established functions, it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does. This is so because inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known.").

by-side foot bindings disposed in the middle section of the top surface of the board, similar to the ones described in Claim 1. The Parten'872 Patent teaches a retractable tow hook displaced on the front section of the board that is nearly identical to the one used on the ZUP Board. The Fleischmann Patent teaches the use of side-by-side handles disposed on the front section of a water recreation device, and the Stewart Patent shows the use of side-by-side "grips", the functional equivalent of handles, on the front section of a board to aid in rider stability. Finally, the Fryar Patent discloses a plurality of rails protruding from the bottom of the board that are disposed relative to the longitudinal axis, like those on the ZUP Board.

The Court further finds by clear and convincing evidence that Claim 9 of the '681 Patent would have been obvious to an ordinary person skilled in the art over the Clark Patent in view of the Parten '000 Patent, the Stewart Patent, and the Monreal Patent.

The Clark Patent discloses the claimed method of engaging a water recreation device with the exception of using side-by-side foot bindings. It teaches users to lie prone on the board, to grip the board with both hands—which is the functional equivalent of side-by-side handles—before assuming a kneeling position, and ultimately to rise to a standing position. The Parten '000 Patent teaches the use of side-by-side foot bindings and expressly anticipates riders moving between a prone, a kneeling, and a standing position while using the product. Moreover, as discussed above, the Stewart Patent shows the use of side-by-side "grips", the functional equivalent of handles, on the front section of a board to aid in rider stability, like those used on the ZUP Board. And the Monreal Patent discloses similar foot bindings, permitting riders to engage in multiple

riding positions while on the water.

It is evident to the Court that Duff identified known elements in the prior art that aided in rider stability while engaging a water recreational device and simply combined them in one apparatus and method. The elements in Claim 1 and 9 are used for the exact same purpose as they were in the prior art and, as expected, lead to the anticipated success of assisting riders in reaching a standing position.

Additionally, the Court finds that one of ordinary skill in the art would have been motivated in 2008 to combine these elements in order to aid in rider stability, to allow a wide variety of users to enjoy the device, and to aid users in maneuvering between positions on a water board. These motivations are a driving force throughout the prior art and have been shared by many inventors in the water recreational device industry. *See, e.g.*, Clark Patent, col. 1, ll. 32–40; Echols Patent, col. 1, ll. 13–15, 28–38; Hornsby Patent, col. 1, ll. 35–37; Parten '872 Patent, col. 2, ll. 49–51. And the specific desire to aid users in maneuvering between positions on a water board has been a consistent motivation in the prior art for decades. *See, e.g.*, Clark Patent, col. 1, ll. 41–46 ; Monreal Patent, col. 1, ll. 39–43; Parten '000 Patent, col. 2, ll.53–54, col. 6, ll. 18–44.

Consequently, the Court finds that there is a strong *prima facie* case that Claims 1 and 9 of the '681 Patent are invalid due to obviousness in view of the above. Still, the Court will assess the three secondary considerations proffered by ZUP to ensure against hindsight bias in reaching this conclusion.

**iv. Secondary considerations**

Trial courts are required to consider objective evidence of non-obviousness in

every case in order to preclude hindsight bias. *See WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1328 (Fed. Cir. 2016) ("Indeed, we have repeatedly stressed that objective considerations of non-obviousness must be considered in *every case*."). Nevertheless, strong evidence of obviousness cannot be overcome by the mere "presence of certain secondary considerations of nonobviousness." *DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*, 464 F.3d 1356, 1371 (Fed. Cir. 2006). Moreover, "a strong prima facie obviousness showing may stand even in the face of considerable evidence of secondary considerations." *Rothman v. Target Corp.*, 556 F.3d 1310, 1322 (Fed. Cir. 2009).

The Federal Circuit has held that secondary considerations are inadequate to establish non-obviousness where the "claimed invention represents no more than the predictable use of prior art elements according to established functions." *Ohio Willow Wood Co. v. Alps South, LLC*, 735 F.3d 1333, 1344 (Fed. Cir. 2013). And, even if secondary considerations exist, the patentee is still required to establish a *prima facie* case that a nexus exists between the novel aspects of the claimed invention and the evidence of secondary considerations in order for that evidence to be given substantial weight. *See Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1310–11 (Fed Cir. 2010); *Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 998 (Fed. Cir. 2009).

ZUP offers three considerations for the Court to consider: (1) that the ZUP Board satisfied a long-felt but unresolved need in the water recreation industry; (2) that Nash copied the ZUP Board; and (3) that the ZUP Board has experienced commercial success.

The Court will address all three considerations.

**a) The ZUP Board has not satisfied a long-felt but unresolved need in the water recreation industry**

ZUP, through its expert, James Emmons—who owns a 2% equity interest in the company (Emmons Decl. ¶ 2)—asserts that "[t]he water-recreation industry had failed over a 50-year period to innovate beyond providing riders stability within various pre-determined positions of tubing, kneeboarding, skiing, or wakeboarding." (Resp. to Mot. for Summ. J. 22 (citing Emmons Decl. ¶¶ 13–16).) ZUP alleges that this unresolved need is evidenced by Nash's "enthusiastic acceptance" of the ZUP Board's "simultaneous engagement of components so riders could more easily get up out of the water." (*Id.* (citing *WBIP,* 829 F.3d at 1332–33 (holding that an acknowledgement by defendant that "The need is clear!" is sufficient to establish evidence of a long felt but unresolved need in an industry)).)

ZUP's assertion of Nash's "enthusiastic acceptance" is wholly derived from two statements allegedly attributable to Keith Parten: (1) "You have a great product by the way!" (App. 568); and (2) "Think you are spot on with Wally Weekender. Same guy that rides a kneeboard and tube. Want to be able to do it the first time every time." (*Id.*)

The Court finds this argument to be entirely devoid of merit. These statements are nothing more than passing compliments at the outset of a business relationship and can hardly be construed to have the same effect as the acknowledgement made by the defendant in *WBIP*, 829 F.3d at 1332–33 ("The *need* is clear!" (emphasis added)). As such, the Court finds that ZUP has provided no evidence apart from conclusory

statements made by its expert that any long-felt but unresolved need existed in the industry.

Further, "where the differences between the prior art and the claimed invention are as minimal as they are here . . . it cannot be said that any long-felt need was unsolved." *Geo. M. Martin Co. v. Alliance Mach. Sys. Int'l LLC*, 618 F.3d 1294, 1304 (Fed. Cir. 2010).

Additionally, even if the differences between the prior art and the claimed invention were substantial, the Court would find that ZUP has failed to provide any evidence that others in the industry attempted and failed to make a board with stabilizing features, such as handles, foot bindings, and rails. (App. 519–32 (collecting prior art).) Absent such a showing, "the mere passage of time without the claimed invention is not evidence of nonobviousness." *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004).

Consequently, the Court finds that ZUP has failed to establish either that a long-felt but unresolved need existed in the water recreational device industry or that its product somehow solved any such need. As such, this consideration does not aid ZUP in overcoming a finding of obviousness.

**b) There is no evidence that Nash copied the ZUP Board**

The Federal Circuit observed in *WBIP* that "[t]he fact that a competitor copied technology suggests it would not have been obvious." *WBIP*, 829 F.3d at 1336.

ZUP asserts that Nash copied its product because the Versa Board "has a tow hook at the front section, side-by-side handles at the front section, and side-by-side foot

bindings at the middle section." (Resp. to Mot. for Summ. J. 23.) But even a cursory review of this claim reveals that, while the Versa Board possesses each of these components, there is no evidence that Nash advertises, instructs, or even encourages its customers to use them at the same time. (*See* App. 266, 379–380, 387–88, 428–42.) Absent such evidence, the Court is hard pressed to reach the conclusion that Nash copied either the apparatus or method claim of the '681 Patent.

Moreover, ZUP has provided no evidence that Nash attempted to independently create the device described in the '681 Patent and failed. *See Vandenburg v. Dairy Equip. Co.*, 740 F.2d 1560, 1567 (Fed. Cir. 1984) ("The copying of an invention may constitute evidence that the invention is not an obvious one. This would be particularly true where the copyist had itself attempted for a substantial length of time to design a similar device, and had failed." (citations omitted)). This deficiency lends even more weight to a finding that Nash did not copy the ZUP Board.

As a result, the Court finds that this consideration does nothing to tip the scales towards a finding of non-obviousness.

**c) ZUP's evidence of the '681 Patent's commercial success is insufficient**

Finally, ZUP argues that the commercial success of the ZUP and Versa Boards supports a finding of non-obviousness. (Resp. to Mot. for Summ. J. 24; *see WBIP*, 829 F.3d at 1337 ("Demonstrating that an invention has commercial value, that it is commercially successful, weighs in favor of its non-obviousness.").) In support of this consideration, ZUP has provided documents showing its total sales since 2012,

amounting to $1,562,426.74.[9] (Wawrzyn Decl. ¶ 3.)

This evidence, alone, is insufficient for the Court to make a determination that ZUP has experienced commercial success. As the Federal Circuit has noted, "evidence related solely to the number of units sold provides a very weak showing of commercial success, if any." *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996); *see also In re Applied Materials, Inc.*, 692 F.3d 1289, 1300 (Fed. Cir. 2012) ("[T]he number of units sold without evidence of the market share is only weak evidence of commercial success."). ZUP has failed to provide sufficient evidence of its market share or how other water recreational devices—apart from the Versa Board—performed in the market during the same time period.

Further, ZUP has failed to make a showing of a nexus between its alleged commercial success and the supposedly novel features contained in the '681 Patent. *See Ethicon Endo-Surgery, Inc. v. Covidien LP*, 812 F.3d 1023, 1034 (Fed. Cir. 2016) ("[T]he patentee must establish a nexus between the evidence of commercial success and the patented invention.")

Therefore, the Court has no choice but to reach the conclusion that ZUP's evidence of commercial success is insufficient to overcome a finding of obviousness.

**v. Conclusion**

In view of the above, the Court finds that it would have been obvious for one of ordinary skill in the art to combine the references in the prior art in order to invent both

[9] ZUP also includes Nash's sales of the Versa Board, totaling $792,361.00 since 2014. (Wawrzyn Decl. ¶ 4.) Since the Court has determined that the Versa Board does not infringe the '681 Patent—either contributorily or by inducement—this figure is irrelevant to the present analysis. *See infra* Part III. B.

the apparatus and method Claims in the '681 Patent. And this finding is not overcome by ZUP's evidence of nonobviousness. Consequently, the Court finds by clear and convincing evidence that Claims 1 and 9 of the '681 Patent are invalid pursuant to 35 U.S.C. §103(a).

Therefore, the Court will grant Defendant's Motion for Summary Judgment as it pertains to Defendant's Counterclaim II, which renders Counts I and II of Plaintiff's Complaint and Defendant's Counterclaim I moot.

**B. Alternatively, Nash Has Not Contributorily Infringed Claim 9 of the '681 Patent Nor Has It Induced Others to Do So**

Assuming *arguendo* that Claim 9 of the '681 Patent was valid, the Court would still grant Nash's Motion for Summary Judgment as it pertains to ZUP's claims of contributory infringement (Count I) and inducement of infringement (Count II).

**i. Nash did not contributorily infringe the '681 Patent**

Congress defined liability for contributory patent infringement in 35 U.S.C. § 271(c):

> Whoever offers to sell or sells within the United States . . . a component of a patented machine, manufacture, combination or composition, or a material or an apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

The Federal Circuit has held that "there can be no . . . contributory infringement without an underlying act of direct infringement." *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1326 (Fed. Cir. 2004) (citation omitted); *see also Dynacore*

*Holdings Corp. v. U.S. Phillips Corp.*, 363 F.3d 1263, 1272 (Fed. Cir. 2004) ("Indirect infringement, whether inducement to infringe or contributory infringement, can only arise in the presence of direct infringement, though the direct infringer is typically someone other than the defendant accused of indirect infringement."); *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 774 (Fed. Cir. 1993) ("Liability for either active inducement of infringement or for contributory infringement is dependent upon the existence of direct infringement.").

In this case, ZUP has provided no evidence of direct infringement. Instead, ZUP relies solely on a Nash customer survey where two customers admitted to "leav[ing] the handles on the Versa board while using the side-by-side foot bindings" to substantiate its assertions that there was direct infringement of Claim 9 of the '681 Patent.[10] (Resp. to Mot. for Summ. J. 15; *see also* App. 389–404 (containing the results of the online customer survey).)

Of course, the fact that two customers left the components on the Versa Board necessary to potentially infringe the apparatus claim of the '681 Patent does not mean ipso facto that they infringed the method claim as well. *See, e.g.*, *Ormco*, 463 F.3d at 1311 ("Method claims are only infringed when the claimed process is performed, not by the sale of an apparatus that is capable of infringing use."); *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 773 (Fed. Cir. 1993) (holding that "[t]he sale of [an apparatus capable of

[10] In the same breath, however, ZUP argues that the "survey evidence is entitled to little weight because of the small sample size of 44 customers and bias inherent in the survey." (Resp. to Mot. for Summ. J. 15 n.5.) It is a bit disingenuous for ZUP to argue both that the survey is entitled to little weight *and* that it should be given substantial weight as the sole source of evidence that direct infringement occurred.

performing a claimed process is] not a direct infringement because a method or process claim is directly infringed only when the process is performed"); *Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 953 F.2d 1360, 1374 (Fed. Cir. 1991) (holding method claims were not directly infringed by the mere sale of an apparatus capable of performing the claimed process). For example, a reasonable jury could find these customers knelt on the board, using the side-by-side foot bindings as kneepads while holding onto the handles. Alternatively, the users could have stood on the board without using the handles at all, merely gripping the side of the board for added stability. Neither use would constitute a direct infringement of every step of Claim 9 of the '681 Patent.

However, the Federal Circuit has upheld claims of indirect infringement based only on circumstantial evidence of direct infringement by unknown parties. *See, e.g.*, *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1318 (Fed. Cir. 2009) ("[T]he jury in the present case could have reasonably concluded that, sometime during the relevant period from 2003 to 2006, more likely than not one person somewhere in the United States had performed the claimed method using the Microsoft products."). Of course, this broad interpretation renders toothless the Federal Circuit's previous holdings requiring plaintiffs to provide evidence of direct infringement. But, since a jury could reasonably conclude that a hypothetical consumer using the Versa Board "more likely than not" used the product in a way that infringed Claim 9 of the '681 Patent, the Court will proceed in its analysis.

Beyond providing evidence of direct infringement, the patent holder must also show that the alleged contributory infringer was both aware of the patent and that its

actions would lead to the infringement. *Commil USA, LLC v. Cisco Systems, Inc.*, 135 S. Ct. 1920, 1926 (2015) (citing *Afro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476 (1964)). The parties in this case do not dispute whether Nash was aware of the patent. It clearly was. (*See e.g.*, App. 572.) However, Nash contends that it cannot be held liable for having knowledge that its actions would lead to an infringement of Claim 9 of the '681 Patent, in part, because the Versa Board has multiple substantial noninfringing uses.

Due to the risk of patentees' attempts to extend their monopolies beyond the limits of a specific grant, the Supreme Court has held—and the Patent Act requires—that the allegedly infringing article or commodity must be unsuited for any commercial noninfringing use. *See generally* 35 U.S.C. § 271(c); *Dawson Chem. Co. v. Rohm and Haas Co.*, 448 U.S. 176 (1980). In other words, the allegedly infringing article must "have no substantial noninfringing uses, and be known (by the party) 'to be especially made or especially adapted for use in an infringement of such patent.'" *i4i Ltd. Partnership v. Microsoft Corp.*, 598 F.3d 831, 851–52 (Fed. Cir. 2010) (quoting 35 U.S.C. § 271(c)).

"[A] substantial non-infringing use is any use that is 'not unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental." *In re Bill of Landing Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1337 (Fed. Cir. 2012). (quoting *Vita-Mix Corp. v. Basic Holdings, Inc.*, 581 F.3d 1317, 1327–29 (Fed. Cir. 2009)). When reaching a determination regarding whether a use is "substantial[ly] non-infringing," the Federal Circuit has instructed that trial courts must "consider not only the

use's frequency, but also the use's practicality, the invention's intended purpose, and the intended market." *i4i Ltd. Partnership*, 598 F.3d at 851. In sum, "the inquiry focuses on whether the accused product[] can be used for purposes *other than* infringement." *In re Bill of Landing Transmission & Processing Sys. Patent Litig.*, 681 F.3d at 1338.

ZUP relies solely on the Federal Circuit's decision in *Ricoh Co., Ltd. v. Quanta Computer Inc.*, 550 F.3d 1325(Fed. Cir. 2008), to support its assertion that "[t]he Versa board is especially adapted to infringe Claim 9 of the '681 patent." (Resp. to Mot. for Summ. J. 26.) In *Ricoh*, the court reversed summary judgment for the defendant where it sold a product containing an infringing microcontroller embedded within a larger product that contained noninfringing components. *Ricoh*, 550 F.3d at 1337. The *Ricoh* court held that "it is entirely appropriate to presume that one who sells a product containing *a component that has no substantial noninfringing use* in that product does so with the intent that the component will be used to infringe." *Id.* at 1338.

ZUP argues that, like the infringing microcontroller in *Ricoh*, the Versa Board's "side-by-side handles . . . and side-by-side foot bindings" can "*only* be used to infringe claim 9 of the '681 patent." (Resp. to Mot. for Summ. J. 26 (emphasis added).) At oral argument, ZUP appeared to contend that even if the Court found that the Versa Board had a single substantially noninfringing use, such a determination would not be fatal to its claims for contributory infringement. This argument contravenes clearly settled and applicable law, and ZUP's assertion that the components of the Versa Board can only be used to infringe defies both sound logic and common sense.

Both the Supreme Court and the Federal Circuit have repeatedly held, without

qualification, that a claim for contributory infringement can only stand if the infringing product has *no* substantial non-infringing use. *See, e.g.*, *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 443–47 (1984); *In re Bill of Lading*, 681 F.3d at 1337; *Cross Med. Prods, Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1312 (Fed. Cir. 2005). As such, it is clear that a finding of a single noninfringing use delivers a fatal blow to a claim of contributory infringement. And in this case, the Court finds that the Versa Board has several.

The Versa Board's side-by-side handles and side-by-side foot bindings can be used in a number of substantially noninfringing ways, and a reasonable jury could not find otherwise. "The foot bindings may be placed side-by-side to ski, but also may be placed in different positions to wakeboard, or be completely removed to wakesurf." (Reb. Br. 15–16.) "The handles may be used for kneeboarding, and may be removed when wakeboarding, waterskiing, or wakesurfing." (*Id.* at 16.) To argue that these components are designed "solely to infringe" ignores the multi-functional use of the Versa Board.

After reviewing the record, the Court concludes that this case is much more similar to the Supreme Court's decision in *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984), than it is to the Federal Circuit's decision in *Ricoh*.

In *Sony*, the Supreme Court held that VCR manufacturers were not liable for contributory copyright infringement when"[t]he accused VCR could be used in two ways: to infringe a copyright by building a 'library' of broadcast movies, or in a substantial, noninfringing way to 'time-shift' a program for later viewing or to record an

uncopyrighted program." *Ricoh*, 550 F.3d at 1339 (citing *Sony*, 464 U.S. at 443–446). As the Federal Circuit noted when discussing *Sony*, "[w]here the [accused] product is equally capable of, and interchangeably capable of both infringing and substantial non-infringing uses, a claim for contributory infringement does not lie." *In re Bill of Lading*, 681 F.3d at 1338. And "[t]he fact that a product may be unavailable for simultaneous non-infringing uses while being used to infringe, is not determinative." *Id.*

Applying the analysis from *Sony* to this case, the Court concludes that the components of the Versa Board can be used in multiple ways that, at most, are "equally capable and interchangeably capable of both infringing and substantial non-infringing uses." *Id.* (discussing *Sony*, 464 U.S. 417). Unlike the infringing microcontroller embedded with noninfringing devices in *Ricoh*, the Court finds that the components of the Versa Board, by themselves, do not directly infringe the '681 Patent. As such, this claim is entirely unmeritorious.

Consequently, even if the '681 Patent was valid, the Court would still grant Nash's Motion for Summary Judgment as it pertains to Count I of ZUP's Complaint.

**ii. Nash did not induce the infringement of the '681 Patent**

"Whoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). Like contributory infringement, "inducement liability may arise 'if, [and] only if, [there is] . . . direct infringement.'" *Limelight Networks, Inc. v. Akamai Technologies, Inc.*, 134 S. Ct. 2111, 2117 (2014) (quoting *Afro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 341 (1961)). As stated above, though ZUP has provided no evidence of direct infringement of Claim 9 of the '681 Patent, the

Court will proceed in its analysis under the Federal Circuit's relaxed standards allowing circumstantial evidence to suffice. *See Lucent Techs., Inc.*, 580 F.3d at 1318.

The Supreme Court has held that liability for induced infringement "requires knowledge that the induced acts constitute patent infringement." *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011); *see also DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) ("[I]nducement requires that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." (citations omitted)). The knowledge requirement may be satisfied by either a showing of actual knowledge or willful blindness. *Global-Tech Appliances, Inc.*, 563 U.S. at 766–71.

Beyond the knowledge requirement, "the inducement must involve the taking of affirmative steps to bring about the desired result." *Id.* at 760. In other words, the "mere knowledge of possible infringement by others does not amount to inducement; specific intent and action to induce infringement must be proven." *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1363 (Fed. Cir. 2003). The Federal Circuit has also found that "[e]specially where a product has substantial non-infringing uses"—of which the Versa Board has several—"intent to induce infringement cannot be inferred even when the defendant has actual knowledge that some users of its product may be infringing the patent." *Id.* at 1365.

In this case, ZUP has offered no evidence that Nash took affirmative steps to induce its customers to infringe Claim 9 of the '681 Patent. To the contrary, the evidence clearly and unequivocally supports the opposite conclusion, and no reasonable jury could

find otherwise.

The entirety of Nash's promotional materials encourages customers to use the Versa Board in a noninfringing manner. (*See* App. 266, 379–380, 387–88, 428–42.) None of the images included in these marketing materials shows users operating the Versa Board in a way that would constitute infringement. (*See id.* at 428–42.) Moreover, the instructions that accompany the product—including a printed warning decal on the board, a warning label in the instructional manual, and a warning molded into the board itself on either side of where the handles could be placed—direct users to remove the handles before attempting to stand up on the board, which would prevent infringement of the method claim. (Mem. in Supp. of Mot. for Summ. J. 33–34; *see also* App. 387–88.) Rather than taking affirmative steps to encourage its customers to use the board in an infringing manner, Nash has done the opposite.

ZUP argues that the wide variety of marketing materials and instructions accompanying the Versa Board are somehow "illusory" because the customer must engage in the "cumbersome" process of "return[ing] to the boat and unscrew[ing] the handles" before standing up on the board. (Resp. to Mot. for Summ. J. 27.) In support of this assertion, ZUP cites only to a YouTube video—which it produced—where it takes a Versa Board user no more than fifty-five (55) seconds to remove the handles. To argue that unscrewing four screws in fifty-five (55) seconds is somehow "cumbersome" or time consuming shows how desperate ZUP is to make this claim stick. Moreover, given the versatility of the Versa Board and the multiple noninfringing uses of the product's component parts, the Court sees no reason to infer intent where there clearly is none. *See*

*Warner-Lambert Co.*, 316 F.3d at 1365.

Therefore, assuming *arguendo* that Claim 9 of the '681 Patent was valid, the Court would still grant Nash's Motion for Summary Judgment as to Count II of ZUP's Complaint because ZUP has provided no evidence that Nash intended to or took active steps towards inducing its customers to infringe the method claim.

**C. ZUP Has Provided No Evidence That Nash Misappropriated Its Trade Secrets**

In Count III of its Complaint, ZUP asserts that Nash violated the Virginia Uniform Trade Secrets Act ("VUTSA"), Va. Code §§ 59.1-336, *et seq.*, by using information that Nash obtained from ZUP in the creation of its Versa Board. (Compl. ¶¶ 50–54.) ZUP alleges that it provided Nash with "confidential information, including 3d AutoCAD design drawings of the ZUP Board and ZUP's confidential supplier-pricing information for the ZUP Board's components," which qualify as "trade secrets" [11] under the VUTSA. Va. Code §59.1-336.

In its Response to the present motion, ZUP attempts to change the scope of Count III by summarily alleging that there is "no doubt" that Nash used both ZUP's cost information and the advice that ZUP shared from its patent attorney regarding patent's validity—a claim not previously raised in the Complaint—"in its determined effort to bring the Versa board to market." (Resp. to Mot. for Summ. J. 28.) Regardless of which

[11] "Trade secret means information, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process that: (1) Derives independent economic value, actual or potential, form not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Va. Code §59.1-336.

alleged trade secrets ZUP contends that Nash has misappropriated, ZUP has provided no evidence to support its assertion.

Under the VUTSA, the plaintiff bears the burden of proving by a preponderance of the evidence that the defendant misappropriated its trade secrets. *MicroStrategy Inc. v. Li*, 268 Va. 249, 255 (2004). ZUP has failed to satisfy that burden in this case. It has provided nothing more than pure speculation and conclusory statements that there is "no doubt" that Nash used ZUP's trade secrets in creating its Versa Board.[12] (Resp. to Mot. for Summ. J. 28.) Absent more, this statement alone is clearly deficient.

Tellingly, ZUP did not contest Nash's assertions concerning Count III at oral argument. Based on its failure to provide a scintilla of evidence or argument that Nash misappropriated trade secrets, the Court can only conclude that ZUP has conceded this claim.

Therefore, the Court will grant Nash's Motion for Summary Judgment as it pertains to Count III of Plaintiff's Complaint.

**D. ZUP Has Provided No Evidence That Nash Breached the Confidentiality Agreement**

Count IV of ZUP's Complaint alleges that Nash breached the confidentiality agreement entered between the two parties on February 5, 2015, by using the confidential

---

[12] Moreover, there is substantial evidence that Nash would have had no need to misappropriate ZUP's trade secrets. Nash has been in the water recreational device industry for over fifty years (Mem. in Supp. of Mot. for Summ. J. 2), presumably has extensive knowledge of the manufacturing costs within the industry, and has its own patent attorney. (Rebuttal Br. 20.) Therefore, the Court finds no compelling justification to infer misappropriation in this case based on the paucity of evidence provided.

information[13] that it received from ZUP in bringing the Versa Board to market. ZUP alleges that it provided Nash "with confidential and proprietary information, including, but not limited to, information regarding: (a) ZUP's vendors; (b) component costs and materials; (c) patent information; (d) marketing plans and strategies; (e) retailer arrangements and contacts; (f) new design concepts and materials; (g) ZUP's intellectual property development and enforcement strategies; and (h) ZUP's proprietary roto-molded 3D computer designed model." (Compl. ¶ 57.)

In similar fashion to its allegation in Count III, ZUP has provided no evidence that Nash used any of ZUP's confidential information in manufacturing and selling its Versa Board. Rather, ZUP summarily concludes that there is "no doubt" that Nash used this information. (Resp. to Mot. for Summ. J. 28.)

Like its approach to Count III, ZUP also failed to contest Nash's assertions concerning Count IV at oral argument. With no evidence or argument presented to the contrary, the Court will not infer a violation of the Confidentiality Agreement based on ZUP's speculation.

Therefore, in view of the dearth of evidence that Nash has in any way breached its contract with ZUP, the Court will grant Nash's Motion for Summary Judgment as to Count IV of the Complaint.

## IV. CONCLUSION

For the preceding reasons the Court finds that Claims 1 and 9 of the '681 Patent

[13] The confidentiality agreement provides that "'Confidential Information' does not include information that . . . is or becomes generally available to the public . . . or was independently developed by Nash Manufacturing, Inc. as a result of work carried out by Nash Manufacturing, Inc. without reference to the Confidential Information." (Mem. in Supp. of Mot. for Summ. J. 39.)

are invalid due to obviousness. Assuming *arguendo* that the patent was valid, the Court would have concluded that Nash did not infringe upon the '681 Patent, either contributorily or by inducement. Further, because ZUP has failed to produce a scintilla of evidence to the contrary, the Court determines that Nash has not misappropriated trade secrets or breached the confidentiality agreement entered into between the two parties.

Therefore, Defendant's Motion for Summary Judgment (ECF No. 35) will be GRANTED as to Defendant's Counterclaim II—rendering Counts I and II of Plaintiff's Complaint and Defendant's Counterclaim I MOOT—and as to Counts III and IV of Plaintiff's Complaint. This case will be DISMISSED WITH PREJUDICE.

An appropriate Order will accompany this Memorandum Opinion.

The Clerk is DIRECTED to send a copy of this Memorandum Opinion to all counsel of record.

/s/
Henry E. Hudson
United States District Judge

Date: Jan. 13, 2017
Richmond, Virginia

US008292681B2

(12) **United States Patent**
**Duff et al.**

(10) **Patent No.: US 8,292,681 B2**
(45) **Date of Patent: Oct. 23, 2012**

(54) **WATER RECREATION DEVICE**

(75) Inventors: **Glen Wade Duff**, Williamsburg, VA (US); **Timothy Walter Zeckser**, Denver, CO (US)

(73) Assignee: **Zup LLC**, Williamsburg, VA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 163 days.

(21) Appl. No.: **12/592,759**

(22) Filed: **Dec. 2, 2009**

(65) **Prior Publication Data**

US 2010/0151754 A1 Jun. 17, 2010

**Related U.S. Application Data**

(60) Provisional application No. 61/200,637, filed on Dec. 2, 2008.

(51) **Int. Cl.**
***B63B 35/73*** (2006.01)

(52) **U.S. Cl.** ............................... **441/65**; 441/70; 441/79

(58) **Field of Classification Search** .................... 441/65, 441/70, 74, 79

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,918,114 A * 11/1975 Schmitt ........................... 441/68
4,678,444 A * 7/1987 Monreal ......................... 441/65
5,083,955 A * 1/1992 Echols ............................ 441/65
5,163,860 A * 11/1992 Clark .............................. 441/65
5,427,047 A * 6/1995 Woodfin et al. ............... 114/253
5,447,116 A * 9/1995 Kobayashi .................... 114/363
5,634,834 A * 6/1997 Cole et al. ....................... 441/65
5,797,779 A * 8/1998 Stewart ........................... 441/74
5,820,430 A * 10/1998 Hornsby et al. ................ 441/65
6,585,549 B1 * 7/2003 Fryar ............................. 441/79
7,216,600 B1 * 5/2007 Hamilton et al. ............. 114/242

* cited by examiner

*Primary Examiner* — Edwin Swinehart

(74) *Attorney, Agent, or Firm* — Mark R. Malek, Esq.; Eugene R. Quinn, Jr., Esq.; Zies Widerman & Malek

(57) **ABSTRACT**

A water recreation device and method of use is contemplated having advantages such as improved stability, maneuverability and ease of use. Embodiments of the contemplated water recreation device include a riding board, handles and a tow hook assembly that are configured to allow a rider to more easily transition to a standing forward-facing position while riding the device. The contemplated device may also include foot bindings or foot grips for added ride stability. The device may alternately include rails disposed on the bottom surface of the riding board. Such rails are adapted to channel water toward the rear bottom section of the riding board to cause the device to achieve an approximately planar orientation relative to the surface of a body of water. This planar orientation provides positioning and stability that further improves the ease of transitioning to a standing position.

**12 Claims, 16 Drawing Sheets**






FIG. 1A




FIG. 1C




FIG. 1B




FIG. 1E




FIG. 1D




FIG. 1F


FIG. 2C


FIG. 2G


FIG. 2I


FIG. 2B


FIG. 2F


FIG. 2E


FIG. 2H


FIG. 2A


FIG. 2D




FIG. 3A




FIG. 3B




FIG. 4A




FIG. 4B




FIG. 4D




FIG. 4C




FIG. 5A




FIG. 5B




FIG. 6A

FIG. 6B

FIG. 6C




FIG. 7A




FIG. 7B




FIG. 8A




FIG. 8B




FIG. 9A




FIG. 9B



FIG. 9C



FIG. 9D



FIG. 9E



FIG. 9F



FIG. 9G



FIG. 9H

# WATER RECREATION DEVICE

## RELATED APPLICATIONS

This application claims the benefit of earlier priority based upon the filing of a provisional patent application, Application No. 61/200,637 (filed on Dec. 2, 2008).

## FIELD OF THE INVENTION

The present invention relates generally to the field of water recreation devices and particularly to a water recreation device suitable for riding in a forward-facing direction while being towed behind a water vehicle.

## BACKGROUND

Many different types of water riding boards and devices currently exist. Some existing single boards allow a rider to be towed behind a boat or jet ski. The width of such boards requires one to ride with feet in a front to back position according to the direction of travel. This is the traditional standing and riding position on a single board. Surf boards, wakeboards and skate boards have relied on this technique for many years. Other prior art devices such as water skis allow for riding in a forward-facing direction with a side-by side foot configuration; however, these devices employ the use of a separate element (e.g. a ski) for each foot. Other solutions such as that disclosed in U.S. Pat. No. 6,306,000 provide a single board that may be operated in a forward facing direction while standing with feet in a side-by-side configuration.

Applicant has recognized that existing solutions suffer a variety of drawbacks related to stability, maneuverability and ease of use. Though the water recreation industry offers many different types of water riding boards and devices, known devices still require a physical capacity or large learning capacity that prevent many riders from achieving full use and enjoyment of these products. Many users are often limited in their experience with current water sports devices due to physical limitations of size and weight, lack of upper body strength, coordination, or athletic prowess. Moreover, the movement and position required to ride standing up on a traditional wakeboard or water skis is often awkward, uncomfortable, or unmanageable for many potential water sport participants. The process of getting to a standing position on existing water recreation devices is a physically strenuous process, utilizing great amounts of upper body strength. Some potential users such as very large individuals, like football players, are unable to participate in this popular activity.

A need thus exists for an improved water recreation device that does not suffer the drawbacks of existing solutions.

## SUMMARY OF THE INVENTION

The disclosed invention advantageously fills the aforementioned deficiencies by providing a water recreation device, which enables individuals who could not ordinarily partake in the activity of towed water boarding.

In its most basic version, the water sports device disclosed herein is made up of the following components: a floatable riding board having a mounted tow hook on the topside of the board, with one particular placement being the front leading edge of the board, although other placements can and will suffice and are intended to be within the scope of this disclosure. The tow hook is mounted to the board, such as for example through the use of bolts. Alternatively, the tow hook



can be built into the board by being molded and formed such that the board and tow hook are one continuous whole.

Versions of the water sports device can additionally have one or more of the following: (1) kneepads adhered to the top side of the riding board; (2) foot grips that will be attached on the top side of the riding board; (3) foot bindings that will be attached to the top side of the riding board; (4) bottom fins that will be attached to the underside of the riding board on either the front, back, or middle sections respectively; (5) one or more handles that will be attached to the top side of the riding board; and (6) rails on the underside of the board to create a channeling or funneling effect with respect to the water sweeping beneath the board so as to direct a concentrated water flow into a condensed space toward the middle back end of the board, thus providing an upward lift and making it easier to achieve planing. Particular modifications of the aforementioned optional features include but are not limited to the kneepads being located in the back half of the top side of the board, foot grips being attached near the middle of the board lengthwise, foot bindings being secured so as to create an arch above the foot grips, and two handles being attached just inside the leading edge of the board and opposite one another (see for example FIG. **2**A through FIG. **2**I). While the embodiments of the device shown throughout typically have two handles, a single handle on one side is within the scope of this disclosure, as is a single handle with placement across the leading edge or relatively close to the front of the board is also within the scope of this disclosure.

The present invention now will be described more fully hereinafter with reference to the accompanying drawings, which are intended to be read in conjunction with both this summary, the detailed description and any preferred and/or particular embodiments specifically discussed or otherwise disclosed. This invention may, however, be embodied in many different forms and should not be construed as limited to the embodiments set forth herein; rather, these embodiments are provided by way of illustration only and so that this disclosure will be thorough, complete and will fully convey the full scope of what has been invented by the inventor.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1**A is a diagram illustrating a top view of a water sports device in accordance with an exemplary embodiment of the invention.

FIG. **1**B is a diagram illustrating a side view of the exemplary water sports device of FIG. **1**A.

FIG. **1**C is a diagram illustrating an end view of the exemplary water sports device of FIG. **1**A.

FIG. **1**D is a diagram illustrating a top view of a tow hook assembly in accordance with the exemplary water sports device of FIG. **1**A.

FIG. **1**E is a diagram illustrating a section view of the exemplary tow hook assembly taken along line A-A, as indicated in FIG. **1**D.

FIG. **1**F is a diagram illustrating a side section view of the exemplary tow hook assembly of FIG. **1**D configured with the water sports device of FIG. **1**A.

FIG. **2**A through FIG. **2**I are diagrams illustrating exemplary water sports devices having riding boards with varying shapes.

FIG. **3**A is a diagram illustrating a bottom view of a water sports device in accordance with another exemplary embodiment of the invention.

FIG. **3**B is a diagram illustrating a section view of the exemplary water sports device of FIG. **3**A taken along line B-B, as indicated in FIG. **3**A.

FIG. **4**A is a diagram illustrating a top view of a water sports device in accordance with another exemplary embodiment of the invention.

FIG. **4**B is a diagram illustrating a side view of the exemplary water sports device of FIG. **4**A.

FIG. **4**C is a diagram illustrating a bottom view of the exemplary water sports device of FIG. **4**A.

FIG. **4**D is a diagram illustrating an end view of the exemplary water sports device of FIG. **4**A.

FIG. **5**A is a diagram illustrating a bottom view of a water sports device in accordance with another exemplary embodiment of the invention.

FIG. **5**B is a diagram illustrating a section view of the exemplary water sports device of FIG. **5**A taken along line C-C, as indicated in FIG. **5**A.

FIG. **6**A is a diagram illustrating a side view of an exemplary water sports device at a first stage of use.

FIG. **6**B is a diagram illustrating a side view of an exemplary water sports device at a second stage of use.

FIG. **6**C is a diagram illustrating a side view of an exemplary water sports device at a third stage of use.

FIG. **7**A is a diagram illustrating a top view of a water sports device in accordance with another exemplary embodiment of the invention.

FIG. **7**B is a diagram illustrating an end view of the exemplary water sports device of FIG. **7**A.

FIG. **8**A is a diagram illustrating a top view of a water sports device in accordance with another exemplary embodiment of the invention.

FIG. **8**B is a diagram illustrating an end view of the exemplary water sports device of FIG. **7**A.

FIG. **9**A is a diagram illustrating an exemplary water sports device and tow rope configured in a disconnected state prior to use.

FIG. **9**B is a diagram illustrating the exemplary water sports device and tow rope configured in a connected state along with a rider in a first position.

FIG. **9**C is a diagram illustrating the exemplary water sports device and tow rope configured in a connected state along with the rider in a second position.

FIG. **9**D is a diagram illustrating the exemplary water sports device and tow rope configured in a connected state along with the rider in a third position.

FIG. **9**E is a diagram illustrating the exemplary water sports device and tow rope configured in a connected state along with the rider in a fourth position.

FIG. **9**F is a diagram illustrating the exemplary water sports device and tow rope configured in the disconnected state during use along with the rider in a fifth position.

FIG. **9**G is a diagram illustrating the exemplary water sports device and tow rope configured the disconnected state during use along with the rider in a sixth position.

FIG. **9**H is a diagram illustrating the exemplary water sports device and tow rope configured in the disconnected state during use along with the rider in a seventh position.

## DETAILED DESCRIPTION

Reference will now be made in detail to the present exemplary embodiments of the invention, examples of which are illustrated in the accompanying drawings.

Referring now to FIG. **1**A, a diagram is shown illustrating a top view of a water sports device **100** in accordance with an exemplary embodiment of the invention. As shown, the water sports device **100** includes a riding board **110** and a tow hook assembly **120**. The water sports device **100** may also include foot bindings **130** (e.g. foot straps) attached to a middle section of a top side of the riding board **110**. Knee padding may also be adhered to a back section of the top side of the riding board **110** (shown as element **710** in FIG. **7**A). Knee padding may alternatively be adhered to both front and back sections of the top side of the riding board **110** (shown as element **810** in FIG. **8**A). Foot grips **140** may also be attached to the middle section of the top side of the riding board **110**. The water sports device **100** may also include one or more fins **150** attached to an underside of the riding board **110**. The fins **150** may be positioned on either the front, back, or middle sections of the underside of the riding board **110**. The device **100** may also include two handles **160** attached to a front section of the top side of the riding board **110**. By way of example, the riding board **110** may be substantially elliptical in shape. In one particular and illustrative, yet non limiting, embodiment of the riding board **110** it may at its widest section have a width of approximately 17 inches and at its longest section a length of about 53.5 inches. Of course, these measurements are merely illustrative and boards of any width and any length that include the features described herein are intended to be within this disclosure and make up the overall invention, which has many different embodiments. By way of further illustration, other riding boards may have a width at the widest point of 28 inches and length of 59 inches, or with respect to a particular version of the board show and discussed infra (see FIG. **5***a* for example) the board may have a wing to wing width of 58 inches and a length of 37 inches.



The riding board **110** may be comprised of a material such as but not limited to: wood, molded plastic, or foam with a fiberglass coating. The riding board **110** may also have a stringer **118** longitudinally disposed along the center of the board for providing structural support. It is noted that the riding board **110** may alternatively be shaped as a diamond, a circle, an oval, or a polygon, the shape being selected based on the desired performance.

FIG. **2**A through FIG. **2**I illustrate a not-limiting set of alternate riding board shapes and fin configurations. The tow hook assembly **120** includes a tow hook **122** having a rearward facing convex section **124** sized to receive a tow rope bar (shown as element **910** in FIG. **9**A). The tow hook assembly **120** may also include fasteners (not shown) such as screws (such as but not limited to metal screws or wood screws), nuts, and bolts for attaching the tow hook **122** to the riding board **110**. The tow hook **122** may be comprised of a material such as but not limited to wood, metal, rubber, or fiberglass. The tow hook **122** and riding board **110** may also be formed as a single component (e.g. by injection molding). In such an embodiment, the tow hook **122** and board **110** may be comprised of the same material. The foot grips **140** and knee pads are preferably comprised of neoprene but may also be comprised of a material such as but not limited to rubber or other suitable flexible waterproof materials. The foot grips **140** and knee pads may be attached to the board by way of an adhesive, such as for example Very High Bond (VHB) tape. The foot bindings **130** are preferably comprised of neoprene but may also be comprised of a material such as but not limited to rubber or other suitable synthetic waterproof materials. The foot bindings **130** may be attached directly to the top surface of the riding board **110** or to the foot grips **140** by way of screws (such as but not limited to metal screws or wood screws), nuts, bolts, or adhesives. The fins **150** are preferably comprised of plastic but may also be comprised of a material such as but not limited to metal or fiberglass. The fins **150** are preferably mounted to the underside of the riding board **110** into slots configured to allow positions and sizes of fins **150** to be adjusted. However, the fins **150** may also be attached directly to the underside of the riding board **110** by way of

fasteners such as metal screws, nuts, bolts, or adhesives. The handles **160** may be attached directly to the top surface of the riding board **110** by way of metal screws, nuts, bolts, or adhesives. The handles are preferably comprised of rubber but may also be comprised of a material such as but not limited to plastic (or another durable polymer), wood, or metal.

Referring now to FIG. **1**B, a diagram is shown illustrating a side view of the exemplary water sports device **100** of FIG. **1**A. As shown, the riding board **110** has a front section **110** and rear section **114** each curving slightly upward away from the center of the riding board. This upward curvature of the front section **110** and rear section **114** mitigates the risk of the rider catching an edge while using the water sports device **100**.

Referring now to FIG. **1**C, a diagram is shown illustrating an end view of the exemplary water sports device **100** of FIG. **1**A. As shown, the riding board **110** has side sections labeled generally as **116**. Each side section **116** also curves slightly upward away from the center of the riding board **110**. The upward curvature of the side sections **116** further mitigates the risk of the rider catching an edge while using the water sports device **100**.

Referring now to FIG. **1**D, FIG. **1**E and FIG. **1**F, diagrams are shown illustrating top, section and side views of the tow hook assembly **120** in accordance with the exemplary water sports device **100** of FIG. **1**A. As shown, the tow hook assembly **120** includes the tow hook **122** having rearward facing convex section **124**. By way of example, the tow hook **122** may also include two holes **126** extending from a top surface of the tow hook **122** through to the bottom surface of the tow hook **122**. The holes **126** are sized and positioned to receive two bolts labeled generally as **126** that protrude from the top surface of the riding board **110**. The bolts **126** may be fixedly submerged or embedded below the surface of the riding board **110** and be of sufficient length to mate with a lock nut positioned at or near the top surface of the tow hook **122**. By way of example, the holes **124** may be counterbored to allow a washer and lock nut to sit below the top surface of the tow hook **122**. The bolts **128** thus provide a means for securing the tow hook **122** to the surface of the riding board **110**. By way of example, the bolts may be 0.1875 inch diameter stainless steel bolts.

Referring now to FIG. **2**A through FIG. **2**I diagrams are shown illustrating water sports devices having varying riding board shapes and fin arrangements. As discussed, the riding board **110** may alternatively be shaped as a diamond, a circle, an oval, a polygon or other alternate shapes such as those shown in FIG. **2**A through FIG. **2**I. The shape of the riding board may be selected based on the desired performance or functional purpose. Riding boards having a larger overall width-to-length ratio provide good stability but lack maneuverability relative to riding boards having smaller width-to-length ratios, thus making them well-suited for inexperienced riders. Conversely, boards having relatively smaller width-to-length ratios such as the riding boards shown in FIG. **2**D and FIG. **2**F provide less stability but more maneuverability making them well-suited for more experienced riders who may desire to perform tricks or other advanced maneuvers while riding. In this manner the shape of the board can be selected based on the skill level of the rider or the functional purpose of the device.

Referring now to FIG. **3**A and FIG. **3**B, diagrams are shown illustrating a bottom view and a section view of a water sports device **300** in accordance with another exemplary embodiment of the invention. As shown, the water sports device **300** includes a riding board **310** that is configured in a similar manner to the water sports device **100** of FIG. **1**. Water sports device **300** may further include elongated rails labeled generally as **312** that protrude below the bottom surface of the riding board **310** and extend generally from the forward section of the riding board **310** to the rear section of the riding board. The rails **312** are configured such that they are spaced closer to one another moving from the forward section of the riding board **310** to the rear section of the riding board. In this manner the rails provide a means for channeling water that moves across the relatively larger front section of the riding board **310** towards the relatively smaller rear section of the riding board, thus increasing the lift provided to the rear section of the riding board than would exist without such rails **312**. The arrows labeled generally as **320** illustrate the channeling effect the rails **312** have on the flow of water across the bottom surface of the board **310**. The rails **312** may extend along the full length of the board or a partial length of the board as shown. By way of example, in one illustrative embodiment the rails, which may be included on any version of the board (see FIG. **2**A through FIG. **2**I for illustrative boards of varying shape) may protrude approximately 0.25 inches to 1.5 inches below the bottom surface of the riding board **310**. Certainly, the rails may protrude less than 0.25 inches or greater than 1.5 inches below the bottom surface of the board. The size, width and curvature of the rails are dictated by the desired channeling or funneling affect desired. The greater the channeling or funneling of water to the back end of the board the greater the lift provided and the easier the board will be to ride for novice users and those not ordinarily well adapted to engage in the activity as a result of age or physical characteristics such as being heavy. In providing increased lift the boards are easier to ride because it is easier to achieve planing, thereby opening up the activity to a variety of individuals without the skill, experience or physical characteristics typically necessary to engage in the activity.



Referring now to FIGS. **4**A and **4**B, diagrams are shown illustrating a top view and a side view of a water sports device **400** in accordance with another exemplary embodiment of the invention. Reference will also be made to FIG. **4**C and FIG. **4**D which further illustrate a bottom view and an end view respectively of the water sports device of FIG. **4**A. As shown, the water sports device **400** includes a riding board **410** configured in a similar manner to the water sports device **100** of FIG. **1**A. Water sports device **400** also includes a rear edge having a concave cutout section **414** (e.g. a fish tail shape) for providing increased maneuverability. The water sports device **400** further includes elongated rails labeled generally as **412** that protrude below the bottom surface of the riding board **410** and extend generally from the forward section of the riding board **410** to the rear section of the riding board. The rails **412** are configured such that they are spaced closer to one another moving from the forward section of the riding board **410** to the rear section of the riding board. In this manner the rails **412** provide a means for channeling water that moves across the relatively larger front section of the riding board **410** towards the relatively smaller rear section of the board, thus increasing the lift provided to the rear section of the board than would exist without such rails **412**. The arrows labeled generally as **422** illustrate the channeling effect the rails **412** have on the flow of water across the bottom surface of the board **410** as the board moves forward as indicated by arrow **424**. The rails **412** may extend along the full length of the board or along a partial length of the board as shown. By way of example the rails **412** may extend approximately 0.5 inches to 0.75 inches below the bottom surface of the riding board **410**.

Referring now to FIGS. **5**A and **5**B, diagrams are shown illustrating a bottom view and a section view of a water sports device **500** in accordance with another exemplary embodiment of the invention. As shown, the water sports device **500** includes a riding board **510** and is configured in a similar manner to the water sports device **100** of FIG. **1**A. Water sports device **500** has a large width-to-length ratio (for example greater than 1:1), thus providing increased stability. The water sports device **500** may further include rails labeled generally as **512** that protrude below the bottom surface of the riding board **510** and extend generally from the forward section of the riding board **510** to the rear section of the riding board. By providing a large width-to-length ratio, such as the one depicted in FIG. **5**A for example, planing can be routinely achieved even without the existence of rails, regardless of the age, size, skill level or experience of the user. Thus, the rails are not as necessary as with respect to other embodiments having a large width-to-length ratio. Of course, the existence of rails in the various embodiments (see generally FIG. **2**A through FIG. **2**I for illustrative, non-limiting structural variants) including those embodiments having a large width-to-length ratio, do allow for the channeling of water to the rear of the device, thereby increasing the lift provided to the rear section of the riding board.

The rails **512** are configured such that they are spaced closer to one another moving from the forward section of the riding board **510** to the rear section of the board. In this manner the rails **512** provide a means for channeling water that moves across the front section of the riding board **510** towards a relatively smaller area of the rear section of the board, thus increasing the lift provided to the rear section of the riding board than would exist without such rails **512**. The rails **512** may extend along the full length of the riding board **510** or along a partial length of the board as shown. By way of example, the rails **512** may extend approximately 0.5 inches to 0.75 inches below the bottom surface of the riding board **510**.

Referring now to FIG. **6**A, FIG. **6**B and FIG. **6**C, diagrams are shown illustrating the hydrodynamic effects of the rails **412** shown in FIG. **4**A. It should, however, be understood that experienced riders can achieve the forces depicted particularly in FIG. **6**B and FIG. **6**C even without the presence of rails. The rails do assist particularly the inexperienced, elderly or out-of-shape rider (among others) with respect to planing. Similarly, boards having a large width-to-length ratio also assist the aforementioned riders and others achieve planing even without the presence of rails, which if present would further assist with respect to planing.

As discussed, riding boards with relatively small width-to-length ratios have advantages related to increased maneuverability. However, in operation, it can be difficult for a rider to achieve a steady plane position with such narrower water recreation devices. The steady plane position is a position in which the riding board is oriented substantially parallel to and above the surface of the water. This position is desirable because it allows the user to easily transition to a standing position. In use, the rider transitions from a starting position in which they lay on a stationary riding board to a standing position in which they stand on the riding board while being pulled through the water by a water vehicle such as a boat. When the rider is in the starting position a large portion of the rider's weight is distributed to the rear section of the riding board. This uneven weight distribution causes the rear section of narrower boards to fall below the surface of the water **610**. FIG. **6**A illustrates the device **400** in an exemplary starting position in which the rear section of the riding board **410** is below the surface of the water **610** and the front of the riding board is raised above the surface of the water **610**. As discussed, the device **400** may be coupled to the boat via a tow rope (see e.g. tow rope **900** in FIG. **9**) that attaches to a tow hook assembly on the device. When the boat first begins pulling the device **400** through the water the angled positioning of the riding board **410** causes the board to resist movement through the water. The angled positioning of the riding board thus causes the device to be difficult to kneel or stand on. Moreover, the resistance of the board creates tension in the tow rope that makes it difficult for the rider to remove the tow rope from the tow hook assembly while maintaining control of the device **400**. However, as previously discussed, the exemplary water sports device **400** includes rails **412** that channel water flow across the bottom surface of the riding board to generate increased lift at the rear end of the board. Arrows **622** illustrate this channeling of water towards the rear end of the riding board **410**. Lift is generated shortly after the device **400** begins moving through the water, thus quickly compensating for the downward force applied by the weight of the rider on the rear section of the riding board **410**. FIG. **6**B illustrates the improved positioning of the device **400** just after the boat has begun pulling the device forward (as indicated by arrow **624**). As shown the rear section of the riding board **410** quickly moves closer to the surface of the water **610** thus allowing the user to more easily begin transitioning to the standing position. FIG. **6**C illustrates the positioning of the device **400** after the boat has begun pulling the device forward with enough speed (as indicated by arrow **626**) to generate sufficient lift (as indicated by arrows **628**) to substantially overcome the downward force applied by the rider thereby allowing the riding board **610** to achieve the steady plane position. In this position the device **400** generates little resistance as it moves through the water **610** thereby decreasing the tension in the tow rope. At this point the rider is able to easily transition to the standing position due to both the improved positioning of the board and the ease with which they may remove the tow rope from the tow hook assembly. It is noted that rails may be included in each of the contemplated water sports devices including those having riding boards with higher width-to-length ratios (e.g. the riding board shown in FIG. **2**B). While the use of such rails with riding boards having smaller width-to-length ratios shows a more significant improvement than when used with boards having larger width-to-length ratios, it is to be understood that a measured improvement is seen in all such embodiments.



Referring now to FIG. **7**A and FIG. **7**B, diagrams are shown illustrating a top view and an end view of a water sports device **700** in accordance with another exemplary embodiment of the invention. As shown, the water sports device **700** includes a riding board **710** and is configured in a similar manner to the water sports device **100** of FIG. **1**. Water sports device **700** also includes knee padding **770** adhered to top side of the riding board **710**. As shown, the knee padding **770** covers a substantial area of the rear section of the top surface of the riding board **710** as well as a section between foot bindings **730** and foot grips **740**. The knee padding **770** is preferably comprised of neoprene but may also be comprised of a material such as but not limited to rubber or other waterproof materials, with suitably flexible waterproof materials and skid resistant materials likewise being appropriate.

Referring now to FIG. **8**A and FIG. **8**B, diagrams are shown illustrating a top view and an end view of a water sports device **800** in accordance with another exemplary embodiment of the invention. As shown, the water sports device **800** includes a riding board **810** and is configured in a similar manner to the water sports device **100** of FIG. **1**. Water sports device **800** also includes knee padding **870** adhered to top side

of the riding board **110**. As shown, the knee padding **870** covers a substantial area of the entire top surface of the riding board **810**. The knee padding **810** is disposed between the top surface of the riding board **810** and handles **860**. The knee padding **810** is also disposed between the top surface of the riding board **810** and foot bindings **830** thus further acting as a foot grip. The knee padding **870** is preferably comprised of neoprene but may also be comprised of a material such as but not limited to rubber or other waterproof materials, with suitably flexible waterproof materials and skid resistant materials likewise being appropriate.

Referring now to FIG. **9**A through FIG. **9**H, diagrams are shown illustrating a method of using the exemplary water sports device **100**. As shown in FIG. **9**A, a water sports device **940** is initially disconnected from a tow rope **900**. As discussed the tow rope includes a tow bar **910** and a rope **920** attached to the end of a boat or similar water vehicle (not shown).

Referring now to FIG. **9**B, a diagram is shown illustrating the exemplary water sports device **940** and tow rope **900** configured in a connected state along with the rider **930** in a first or starting position. At a first step, the rider **930** lays with torso on the riding board **942** and allows legs and feet to rest in the water. Before the boat begins to move the rider **930** will first hook the tow bar **910** into a concave section of tow hook **952**. Once the tow bar **910** is connected to the water sports device **940**, the rider **930** then grasps the handles **960**. At this point the rider **930** has established the first position which is the starting position. This first position is to be maintained until the boat pulls the water sports device **940** up to a steady plane on the water. The water sports device **940** has reached a suitably steady plane when the riding board **942** is oriented in a substantially parallel position relative to the surface of the water. With respect to using the board, a substantially parallel orientation is intended to cover those riding positions that achieve a suitably steady planing. As such, a substantially parallel orientation for one rider may differ from a substantially parallel orientation preferred by another rider, varying relative to comfort level unique to a particular rider and dictate by the rider being comfortable enough with the level of planing achieved so as to take the next steps toward kneeling and/or standing on the board. It should also be noted that in this figure the rider **930** is holding on to the handles **960** on either side of the riding board **942**, not the tow rope **900**, after it has been attached.

Referring now to FIG. **9**C, a diagram is shown illustrating the exemplary water sports device **940** and tow rope **900** configured in a connected state along with the rider **930** in a second position. As the boat pulls the water sports device **940** and the riding board **942** begins to plane on the surface of the water, the rider **930** can begin to pull themselves to a kneeling position on a back section of the top surface of the riding board **942**. FIG. **9**C shows the rider having established the second position in which they are kneeling on the riding board **942**. It is noted that in the second position, the rider **930** continues to grasp the handles **960** for support, and that the device **940** continues to be pulled directly by the tow rope **900** that is still attached to the tow hook **952**.

Referring now to FIG. **9**D and FIG. **9**E, diagrams are shown illustrating the exemplary water sports device **940** and tow rope **900** configured in a connected state along with the rider **930** in third and fourth positions respectively. At this step, the rider **930** begins to move forward on the riding board **940** by placing one foot at a time on to the foot grips **980** located on either side of the board. FIG. **9**D shows the rider **930** having established the third position in which one foot as been placed in to one of the foot grips **980** and under one of the foot bindings **990**. FIG. **9**E shows the rider **930** having established the fourth position in which both feet are placed on the foot grips **980** and under the foot bindings **990**. In the fourth position the rider **930** has established a crouched riding position that provides sufficient stability to allow the rider **930** to subsequently remove their grasp of the handles **960** and take hold of the tow bar **910**. It is noted that in the third and fourth positions, the rider **930** continues to grasp the handles **960** for support, and that the device **940** continues to be pulled directly by the tow rope **900** that is still attached to the tow hook assembly **950**.

Referring now to FIG. **9**F, a diagram is shown illustrating the exemplary water sports device **940** and tow rope **900** configured in the disconnected state during use along with the rider **930** in a fifth position. At this step, the rider **930** slowly and easily disengages the tow bar **910** from the tow hook assembly **950** and establishes the fifth position which is sufficiently stable to allow them to use their own energy to maintain the connection between the boat and themselves. In the fifth position the rider **930** maintains a crouched position for best balance and to prepare to stand slowly while holding the tow rope **900** in front of them.

Referring now to FIGS. **9**G and **9**H, diagrams are shown illustrating the exemplary water sports device **940** and tow rope **910** configured in the disconnected state during use along with the rider **930** in sixth and seventh positions respectively. At this step, the rider **930** first transitions to the sixth position in which they begin to stand with feet apart while maintaining a direct connection to the boat via direct connection to the tow rope **910**. During the next and final step, the rider **930** rises to a full standing position, and assumes a forward facing stance: feet apart, shoulders square, hips forward, and knees slightly bent or straight. The rider has thus established the seventh position in which they may remain connected to the board via foot bindings **990** and to the boat via tow rope **910**. In the seventh position the water sports device **940** provides the rider **930** with sufficient balance and stability to ride in a standing position and to perform tricks or other advanced maneuvers.

In an alternate embodiment, the riding board may include a first layer formed from two symmetrical sections. The two sections may include a left section and a right section, the left and right sections being attached to one another by way of hinges or similar pivoting fasteners. The left and right sections may be comprised of wood, molded plastic, or foam with a fiberglass coating. The riding board may also include an inflatable second layer positioned above the two top layers. The second layer may be attached to the first layer by way of an adhesive. The first layer and the second inflatable layer may be configured such that the riding board may be folded in half with the top layer in a deflated state. When inflated the top layer may hold the bottom layer in an open state suitable for riding, and additionally serve as a padding that creates a more comfortable experience to the rider.

In another alternate embodiment, the riding board may include removable outer sections for increasing or decreasing the overall width or shape of the board. In this manner the rider may remove or add additional sections to increase or decrease the difficulty level of the board respectively. Elastic rings may also be provided, each ring being sized to securely fit around the full perimeter of the riding board with different sections attached.

Thus, a water recreation device and method of use is contemplated having advantages including improved stability, maneuverability and ease of use. The contemplated device allows for riding in a side-by-side foot position on a single board, making the ride much more natural and comfortable

relative to existing solutions. The contemplated water recreation device may include a tow hook assembly and handles that are configured to allow a rider to more easily transition to a standing position while riding the device. The contemplated device may also include foot bindings or foot grips for added stability. Additional embodiments of the device may alternately include elongated rails disposed on the bottom surface of the riding board. Such rails are adapted to channel water toward the rear bottom section of the board to cause the device to achieve an orientation relative to the surface of a body of water that further improves the ease of transitioning to a standing position.

While the present invention has been described above in terms of specific embodiments for purposes of illustration, it is to be understood that the invention is not limited to these disclosed embodiments. Likewise, while "the invention" or "present invention" may have been referred to at times in this disclosure those terms are not intended to limit the scope of this disclosure or to suggest in any way that there is a single version or embodiment. While the invention relates generally to a water sports device, the water sports devices that fall within the scope of this disclosure may include a variety of optional features, which do not need to be present in every version or embodiment. Various modifications and changes can be made without departing from the spirit of the invention. In fact, modifications and other embodiments of the invention will also come to mind of those skilled in the art to which this invention pertains, and which are intended to be and are covered by both this disclosure and the appended claims. It is indeed intended that the scope should be determined by proper interpretation and construction of the appended claims and their legal equivalents, as understood by those of skill in the art relying upon the disclosure in this specification and the attached drawings.

What is claimed is:

**1**. A water recreation device comprising:

a riding board having a top surface, a bottom surface, a front section, a middle section, and a rear section;

a tow hook disposed on the front section of the riding board;

first and second handles disposed side-by-side on the front section of the top surface of the riding board aft of the tow hook;

first and second foot bindings disposed side-by-side on the middle section of the top surface of the riding board aft of the first and second handles; and

a plurality of rails protruding from the bottom surface of the riding board and extending substantially the full length of the riding board;

wherein the tow hook includes a rearward-facing concave section sized to receive a tow rope bar and positioned to allow the riding board to be pulled in a forward direction by a tow rope attached to the tow rope bar,

wherein the first and second handles and the first and second foot bindings are configured for simultaneous engagement by a rider to position the rider in a crouching stance facing in a forward direction,

wherein the plurality of rails are disposed relative to a longitudinal axis along the bottom surface of the riding board, the longitudinal axis projecting rearwardly from a reference location substantially central to the front section, and each of the plurality of rails is laterally spaced closer to the longitudinal axis nearest the rear section of the riding board than the each of the plurality of rails is laterally spaced from the longitudinal axis nearest the front section of the riding board thereby allowing the water that moves across the bottom surface nearest the front section of the riding board to funnel towards the bottom surface nearest the rear section of the riding board for the purpose of generating lift force against the bottom surface of the riding board.

**2**. The water recreation device of claim **1**, wherein the riding board is sufficiently wide to allow the rider to stand facing in a forward direction and with feet spaced approximately shoulder-width apart, and wherein the each of the plurality of rails protrudes from the bottom surface of the board about 0.25 inches to about 1.5 inches.

**3**. The water recreation device of claim **2**, wherein the riding board is wider than it is long, length being measured from an outermost edge of the front section to an outermost edge of the rear section and width being measured from an outermost edge of a left side of the middle section to an outermost edge of a right side of the middle section.

**4**. The water recreation device of claim **2**, wherein the riding board includes a rear edge having a concave cutout section.

**5**. The water recreation device of claim **1**, wherein the tow hook is removably attached to the top surface of the riding board by way of bolts protruding from the top surface of the riding board.

**6**. The water recreation device of claim **3**, further comprising one or more knee pads disposed on the top surface of the riding board and coupled to the top surface of the riding board by way of an adhesive.

**7**. The water recreation device of claim **6**, further comprising first and second foot pads disposed on the top surface of the riding board and coupled to the top surface of the riding board by way of an adhesive.

**8**. The water recreation device of claim **7**, wherein the first and second foot pads are spaced shoulder-width apart.

**9**. A method of riding a water recreation device on a body of water comprising:

placing a water recreation device into a body of water, the water recreation device comprising:

a riding board having a top surface, a bottom surface, a front section, a middle section, and a rear section;

a tow hook disposed on the front section of the riding board;

first and second handles disposed side-by-side on the front section of the top surface of the riding board aft of the tow hook; and

first and second foot bindings disposed side-by-side on the middle section of the top surface of the riding board aft of the first and second handles;

attaching a tow rope to said tow hook, said tow rope also attached to a water vehicle;

grasping the first and second handles of the water recreation device to establish a prone start position by a rider;

maintaining said prone start position by the rider until the riding board has achieved a substantially parallel position relative to the surface of the water;

achieving a kneeling position by the rider by placing both knees on the top surface of the riding board;

achieving a crouching position by the rider by placing a first foot into the first foot binding and then placing a second foot into the second foot binding;

grasping the tow rope by the rider by releasing the first and second handles;

removing the tow rope from the tow hook by the rider;

standing on the riding board by the rider while continuing to grasp the tow rope.

**10**. A water recreation device comprising:

a riding board having a top surface, a bottom surface, a bow, a stern, a port, and a starboard;

first and second handles disposed side-by-side on the top surface of the riding board aft of the bow; and

first and second foot bindings disposed side-by-side on the top surface of the riding board aft of the first and second handles; and

a plurality of rails protruding from the bottom surface of the riding board and extending substantially the full length of the riding board;

wherein the first and second handles and the first and second foot bindings are configured for simultaneous engagement by a rider to position the rider in a crouching stance facing the bow of the riding board,

wherein the plurality of rails are disposed relative to a longitudinal axis along the bottom surface of the riding board, the longitudinal axis projecting rearwardly from the bow, and each of the plurality of rails is laterally spaced closer to the longitudinal axis nearest the stern of the riding board than the each of the plurality of rails is laterally spaced nearest the bow of the riding board thereby allowing the water that moves across the bottom surface nearest the bow of the riding board to funnel towards the bottom surface nearest the stern of the riding board for the purpose of generating lift force against the bottom surface of the riding board.

**11**. The water recreation device of claim **10**, wherein the riding board is wider than it is long, length being measured from the bow to the stern and width being measured from the port to the starboard and wherein the each of the plurality of rails is disposed in relation to the longitudinal axis at an angle that is greater than 20 degrees.

**12**. The water recreation device of claim **11**, wherein the bottom surface of the riding board includes a rear edge near the stern having a concave cutout section, and wherein the each of the plurality of rails protrudes from the bottom surface of the board about 0.25 inches to about 1.5 inches.

* * * * *